[Cite as *In re J.R.*, 2019-Ohio-3500.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE:  J.R.

:      APPEAL NO. C-190342
       TRIAL NO. F15-2293X

:      *O P I N I O N.*


Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  August 30, 2019


*Christopher P. Kapsal*, for Appellant Father,

*Raymond T. Faller*, Hamilton County Public Defender, and *Elizabeth Stringer*, Assistant Public Defender,  Guardian ad Litem for J.R.,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Jonathan Halvonik*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services.

**MYERS, Presiding Judge.**

{¶1}    Appellant father appeals from the Hamilton County Juvenile Court's judgment granting permanent custody of his son J.R. to the Hamilton County Department of Job and Family Services ("HCJFS").  In a single assignment of error, father argues that the juvenile court abused its discretion in finding that a grant of permanent custody was in J.R.'s best interest.  Finding father's argument to be without merit, we affirm the trial court's judgment.

### 1.  Factual and Procedural Background

{¶2}    J.R. was born on June 1, 2015.  He suffers from a genetic disorder known as Noonan Syndrome,[1] and shortly after J.R.'s birth, a gastrointestinal tube ("G-tube") was surgically inserted into his stomach because he had been experiencing difficulty eating.  On September 25, 2015, HCJFS was granted an emergency order for custody of J.R.  The agency subsequently filed a complaint for temporary custody of J.R. and two older siblings, alleging that J.R. had been admitted to Children's Hospital approximately one week before the complaint was filed, where doctors determined that he was malnourished and suffered from environmental failure to thrive.  J.R. gained weight once admitted to the hospital.

{¶3}    J.R. was placed in a foster home, while his siblings remained with mother under protective orders.  On January 25, 2016, J.R. and his siblings were adjudicated dependent.  Following a dispositional hearing, legal custody of J.R. was remanded to mother on August 5, 2016, with orders of protective supervision granted to HCJFS.

---

[1] Per testimony in the record, Noonan Syndrome is a genetic disorder that is characterized by unusual facial features, heart problems, bleeding problems, issues with feeding, cognitive delays, and an abnormal growth of the rib cage.  Individuals with Noonan Syndrome do not feel hunger and fullness in the same way a person without the syndrome does.

{¶4} J.R. remained in mother's care until February 1, 2017, when HCJFS was granted an interim order of custody after filing an amended complaint for temporary custody. The complaint alleged that J.R. was neglected and dependent, that his weight had fluctuated since returning to mother's care, and that HCJFS had concerns that mother was not appropriately administering J.R.'s G-tube feedings.

{¶5} On April 25, 2017, J.R. was adjudicated dependent and neglected and was placed in the temporary custody of HCJFS. And on November 6, 2017, HCJFS filed a motion to modify temporary custody to permanent custody. Paternal grandmother Rose Stephens filed a motion for legal custody of J.R.

{¶6} A trial was held over the course of four days from July 2018 to December 2018 on HCJFS's motion to modify and Stephens's petition for custody.

{¶7} Mother testified on both the first and last days of the permanent-custody trial. She acknowledged that eviction papers had previously been filed against her, but testified that she currently had secure housing and lived with her four other children. Mother testified that J.R. has Noonan Syndrome, which she described as a failure to thrive, and she explained that he needs to supplement what he is unable to eat by mouth with G-tube feedings. J.R. had multiple medical appointments because of this condition, and mother testified that she had attended all of J.R.'s appointments, although there was evidence to the contrary.

{¶8} Mother explained that she had visited J.R. every Saturday at the Family Nurturing Center ("FNC"), and that she had fed him through his G-tube during each visit. Mother did not prepare the food that was fed to J.R., but used a previously prepared mixture of ingredients. She stated that she had received training on how to administer food through the G-tube, and she discussed the process of administering a G-tube feeding. Mother would bring J.R.'s siblings along on many of her visits, and she testified that the children had interacted well together.

{¶9} Mother testified that she had completed all services requested by HCJFS, including parenting classes, drug screens, therapy at the Talbert House, and

3

participation in an intensive family-restoration program ("IFRS"). She explained that she had completed these services the first time that J.R. was removed from her care, and that she had not been asked to complete any additional services following J.R.'s removal from her home in February of 2017. Mother acknowledged that she had tested positive for marijuana when the case was first initiated, and that she had tested positive for Oxycodone in April of 2017, but she explained that she had been prescribed the Oxycodone for a head injury.

{¶10} Mother was unemployed when the permanent-custody trial began, but when she testified for the second time at the end of the trial, she had obtained employment in the home-health-care field. She explained that, if granted custody of J.R., she hoped to find a preschool with a nurse certified in G-tube feedings. Mother denied being diagnosed with bipolar disorder or adjustment disorder.

{¶11} Several HCJFS caseworkers had responsibility for J.R.'s case during the pendency of this action. Caseworker Nia Taylor was assigned the case from August of 2017 until January of 2018. When Taylor was first assigned J.R.'s case, his permanency goal was to be returned to mother, but Taylor requested that permanent custody be granted to HCJFS due to mother's inability to handle J.R.'s medical needs.

{¶12} Taylor testified that HCJFS had requested that mother complete an updated diagnostic assessment, participate in random urine screens, attend parenting classes, and participate in the IFRS program. While mother was consistent in her visitation with J.R. and interacted with him in a nurturing and caring manner, she failed to undergo the updated diagnostic assessment and did not complete any of the other requested services, although Taylor conceded that she had never actually requested urine screens when she was managing the case. Taylor further testified that she had had difficulty reaching mother other than during scheduled visitation at the FNC, despite making numerous attempts to reach mother at home and sending mother a letter detailing all of J.R.'s medical appointments.

Taylor had concerns with mother's ability to follow medical recommendations from J.R.'s providers because mother's attendance at J.R.'s medical appointments had been sporadic. Taylor was concerned that without consistent attendance at these appointments, mother would not be familiar with changes in J.R.'s development and his feeding needs.

{¶13} Taylor testified that J.R. had remained in the same foster home throughout the action, and that he was bonded with his caregivers, who were very responsive to his medical needs. Father was incarcerated when Taylor took over case responsibility, and she had no engagement with him. Nor did she have any interaction with Stephens.

{¶14} HCJFS caseworker Sean Bostic took over case responsibility after Taylor. Bostic set up visitation between father and J.R., as father had not seen J.R. for a lengthy period of time due to his incarceration. Bostic additionally requested that father participate in parenting services, obtain housing, and complete a diagnostic assessment. Bostic testified that father complied with all requested services. Bostic contacted Children's Hospital to see if father could participate in classes to learn about Noonan Syndrome, but the hospital stated that they preferred to see father attending J.R.'s medical appointments before learning how to manage the syndrome through classes. Father did not attend any medical appointments, although there was testimony that he did not know when these appointments were. Bostic also attempted to set up a class for father to learn how to administer G-tube feedings, but the hospital stated that father needed to set up the appointment on his own. Father never did. Despite father's compliance with services, Bostic believed that a grant of permanent custody was in J.R.'s best interest. Bostic's primary concerns were that father lacked familiarity with Noonan Syndrome, and that he was a registered sex offender following his conviction for a sex offense against a child. Additionally, father never provided proof of a stable income and had not progressed to unsupervised or extended visitation.

{¶15} Bostic testified that he had spoken with Stephens several times and had arranged for her to attend J.R.'s visitation with father. Bostic was concerned that Stephens and J.R. had just recently met for the first time, and that Stephens had not attended any of J.R.'s medical appointments.

{¶16} Bostic had two home visits with mother, where she informed him that she had completed all requested services. But when Bostic investigated further, he learned that mother had not completed parenting classes or participated in an updated diagnostic assessment. Bostic's main concerns with mother were that she had not consistently attended J.R.'s medical appointments, and that the father of one of her other children had a criminal history of trafficking in drugs. Bostic further noted that, like father, mother had not progressed past supervised visitation.

{¶17} Both foster parents testified. At the time of trial, J.R. had lived in his foster home for approximately 18 months. Nine children resided in the home, including several adopted children, several foster children, and a grandchild of the foster parents. Testimony indicated that J.R. interacted well with the other children and had a close relationship with his foster parents. In addition to J.R., two other children residing in the home were fed through a G-tube. Foster mother explained that J.R. is fed on a schedule set forth by his feeding team, which consists of a team of doctors who establish J.R.'s feeding based on his weight gain or lack thereof and encourage him to eat by mouth. Foster mother testified that she mixes a batch of J.R.'s food each day, and she explained the contents of the mixture and J.R.'s feeding schedule. J.R. is now fed through a syringe directly into the G-tube, but was initially fed through a machine that would pump food into the G-tube. Foster mother testified that when J.R. was fed with the machine and pump by mother at visitation, the pump would be returned with the wrong dose in it. After foster mother commented on this issue, the pump would be returned cleaned out. J.R. continued to gain weight while residing in his foster home.

{¶18} Foster mother explained all the medical appointments that J.R. had attended, which, at the time of her testimony, included seeing a geneticist every six months, meeting with the feeding team every three months, and attending annual appointments with his primary care physician and an ophthalmologist. These appointments had greatly decreased since J.R. first entered the foster parents' home. Foster mother testified that J.R.'s mother had initially attended every medical appointment, but that as time went on, mother's attendance had decreased, with mother missing three of J.R.'s last four feeding appointments, as well as his last two ophthalmology appointments. Neither father nor Stephens attended any appointment for J.R. that foster mother attended.

{¶19} Father testified that he currently lived in a one-bedroom apartment, but intended to move into a two-or-three bedroom apartment in the same complex. Father stated that he was unemployed, but received a monthly disability check. He testified that he had a cosmetology license, and that he had run a barbershop prior to being incarcerated. Father explained that he had been trained on how to operate a G-tube, and that he had previously administered feedings through the machine and pump. Father testified that he had complied with the services requested by HCJFS, and that his visits with J.R. had gone well.

{¶20} Stephens testified that she had not met J.R. before visiting with him at the FNC, but that she wanted a chance to try and help him. She conceded that she had not visited with J.R. in approximately three months. And she testified that she had never administered a G-tube feeding, but had seen one administered by another family member.

{¶21} The magistrate issued an entry granting HCJFS's motion for permanent custody and denying Stephens's motion for legal custody. With respect to Stephens, the magistrate found that a grant of custody to her was not in J.R.'s best interest due to her limited contact with J.R. and her limited knowledge of his special needs. In support of its decision to grant HCJFS's motion, the magistrate found that

J.R. had been in agency custody for over 12 or more months of a consecutive 22-month period, that J.R. could not and should not be placed with either parent within a reasonable time, and that a grant of permanent custody was in J.R.'s best interest.

{¶22} Both father and mother filed objections to the magistrate's decision. The trial court overruled all objections, accepted and approved the magistrate's decision as its own, and entered judgment denying Stephens's petition for custody and granting permanent custody of J.R. to HCJFS.

## 2. *Legal Analysis*

{¶23} Only Father has appealed, arguing in a single assignment of error that the trial court erred and abused its discretion in finding that a grant of permanent custody was in J.R.'s best interest. He argues that the finding was not supported by sufficient evidence and was against the manifest weight of the evidence. Neither mother nor Stephens have filed an appeal.

{¶24} We review the juvenile court's judgment to determine whether it is supported by clear and convincing evidence. *In re J.W. and H.W.*, 1st Dist. Hamilton No. C-190189, 2019-Ohio-2730, ¶ 13. An examination into the sufficiency of the evidence requires this court to determine whether the juvenile court had sufficient evidence before it to satisfy the clear-and-convincing standard. *Id.* But when examining the manifest weight of the evidence, we review the record to determine if the juvenile court lost its way and created such a manifest miscarriage of justice in resolving conflicts in the evidence that its judgment must be reversed. *Id.*; *In re T/R/E/M*, 1st Dist. Hamilton No. C-180703, 2019-Ohio-1427, ¶ 11.

{¶25} R.C. 2151.414(B) provides that a trial court may grant permanent custody of a child to a children-services agency if it finds that a grant of permanent custody is in the child's best interest pursuant to the factors contained in R.C. 2151.414(D), and that one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e) apply. Here, the trial court found that a grant of permanent custody was

in J.R.'s best interest, and that the following two conditions in R.C. 2151.414(B)(1) were applicable: that the child had been in the temporary custody of a children services agency for 12 or more months of a consecutive 22-month period, pursuant to R.C. 2151.414(B)(1)(d), and that the child cannot or should not be placed with either parent within a reasonable time, pursuant to R.C. 2151.414(B)(1)(a). The court further made several findings under R.C. 2151.414(E) to support its finding that J.R. could not or should not be placed with either parent within a reasonable time.

### A. 12-of-22 Condition

{¶26} Father first challenges the trial court's finding that J.R. could not or should not be placed with either parent within a reasonable time, contending that the record did not support the trial court's findings under R.C. 2151.414(E). We do not address the merits of this argument. A trial court is only required to find the applicability of one factor under R.C. 2151.414(B)(1). *See In re E.A.*, 12th Dist. Warren No. CA2019-02-012, 2019-Ohio-2964, ¶ 22. Here, in addition to finding that J.R. could not or should not be placed with either parent within a reasonable time, the trial court found, in accordance with R.C. 2151.414(B)(1)(d), that J.R. had been in the custody of HCJFS for 12 or more months of a consecutive 22-month period. This finding was supported by clear and convincing evidence.

{¶27} In determining whether a child has been in agency custody for 12 or more months of a consecutive 22-month period, a court considers all periods of time in which the child was in agency custody within the relevant 22-month period. This may encompass one continuous period of agency custody or a situation in which a child was placed in agency custody, then was briefly out of agency custody, but then returned to agency custody. *In re N.M.P.*, 2018-Ohio-5072, 126 N.E.3d 200, ¶ 59 (11th Dist.); *In re T.B.*, 9th Dist. Summit No. 21124, 2002-Ohio-5036, ¶ 23. A child is considered to have entered the temporary custody of an agency on the earlier of the date that the child is adjudicated or the date that is 60 days after the child's removal

from home. R.C. 2151.414(B)(1); *In re J.G.S.*, 1st Dist. Hamilton Nos. C-180611 and C-180619, 2019-Ohio-802, ¶ 37.

{¶28} HCJFS filed for permanent custody on November 6, 2017. And the record shows that J.R. had been in agency custody for 12 or more months in the 22-month period preceding that date, which began on January 6, 2016. J.R. was removed from mother's home for the first time on September 25, 2015, and was adjudicated dependent for the first time on January 25, 2016. We thus use the date that was 60 days after J.R.'s removal from home, November 25, 2015, for purposes of determining when he entered agency custody. At the time that J.R. was returned to mother's care on August 5, 2016, he had been in agency custody for seven months of the relevant 22-month period. J.R. entered agency custody for the second time on February 1, 2017, and was again adjudicated dependent on April 25, 2017. Using the date of April 1, 2017, which was 60 days after J.R.'s removal from home, we determine that he had been in agency custody for approximately seven more months at the time that the motion for permanent custody was filed.

{¶29} Because clear and convincing evidence supported the juvenile court's determination that J.R. had been in agency custody for 12 or more months of a consecutive 22-month period, we need not determine the weight and sufficiency challenges to the juvenile court's findings under R.C. 2151.414(E) in support of its determination that J.R. could not or should not be placed with either parent within a reasonable time. *See In re S.M.*, 4th Dist. Highland No. 14CA4, 2014-Ohio-2961, ¶ 2 (holding that where the court determined that a child had been in agency custody for 12 or more months of a consecutive 22-month period, "it did not need to also find that the child could not or should not be returned to [the parent] within a reasonable time. Thus, any reference in the court's judgment to that requirement would be mere surplusage and, any error would be harmless.").

## B. Best-Interest Determination

{¶30} Father next argues that the evidence did not support the trial court's determination that a grant of permanent custody was in J.R.'s best interest. Following our review of the record, we find that the trial court's best-interest determination was supported by clear and convincing evidence.

{¶31} The record demonstrates that mother was consistent with visitation, and that J.R. was bonded with her and his biological siblings. Father was also consistent with visitation and was bonded with J.R., although his involvement with J.R. and participation in services began much later than mother's due to his incarceration. And prior to the initiation of these proceedings and his incarceration, he had limited contact with J.R. Despite both parents' more recent consistency in visiting with J.R., neither progressed past supervised visitation. J.R. was also bonded with his foster parents and foster siblings, and he thrived while in his foster home. *See* R.C. 2151.414(D)(1)(a).

{¶32} While J.R. was too young to express his own wishes regarding custody, his guardian ad litem was in favor of a grant of permanent custody. *See* R.C. 2151.414(D)(1)(b). HCJFS was involved with J.R. since shortly after his birth, and, as explained above, he was in agency custody for 12 or more months of a consecutive 22-month period. *See* R.C. 2151.414(D)(1)(c).

{¶33} The record further demonstrates that J.R. needed a legally secure placement that could only be achieved through a grant of permanent custody. *See* R.C. 2151.414(D)(1)(d). Because he suffers from Noonan Syndrome, J.R. requires feeding through a G-tube and must attend frequent medical appointments. J.R. was twice removed from mother's home because he lost weight while under her care. J.R. never resided with father, a registered sex offender following his conviction for a sex offense against a child, for an extended period of time. Mother did not consistently attend J.R.'s medical appointments, and father did not attend any

appointments. Attendance at those appointments was crucial for an understanding of J.R.'s nutritional needs and ability to maintain a healthy weight gain. And while father had housing, he never provided proof of a stable income.

{¶34} We further find that this was not the rare case in which the trier of fact lost its way in weighing the evidence and created such a manifest miscarriage of justice that its judgment must be reversed. See *In re J.W. and H.W.*, 1st Dist. Hamilton No. C-190189, 2019-Ohio-2730, at ¶ 13; *In re T/R/E/M*, 1st Dist. Hamilton No. 180703, 2019-Ohio-1427, at ¶ 11. The trial court's determination that a grant of permanent custody was in J.R.'s best interest was supported by both the sufficiency and the weight of the evidence. Father's assignment of error is overruled, and the judgment of the trial court is affirmed.

Judgment affirmed.


**BERGERON** and **WINKLER, JJ.,** concur.



Please note:

The court has recorded its own entry on the date of the release of this opinion.