[Cite as *In re R.M.S.*, 2019-Ohio-4281.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: R.M.S., J.L.B., AND N.A.B.

:      APPEAL NOS. C-190378
                           C-190386
                           C-190405

:      TRIAL NO. F10-1569X

:      *O P I N I O N.*

Appeals From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed in C-190378 and C-190405; Appeal Dismissed in C-190386

Date of Judgment Entry on Appeal: October 18, 2019

*Cynthia S. Daugherty*, for Appellant R.B., father of N.A.B.,

*Jon R. Sinclair*, for Appellant R.S., father of R.M.S.,

*Roger W. Kirk*, for Appellant Mother,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Jacqueline O'Hara*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Elizabeth Stringer*, Assistant Public Defender, Appellee Guardian ad Litem for R.M.S., J.L.B., and N.A.B.

**MYERS, Judge.**

{¶1}   In these consolidated appeals, mother and the fathers of two of her children each appeal from the Hamilton County Juvenile Court's judgment granting permanent custody of R.M.S., J.L.B., and N.A.B. to the Hamilton County Department of Job and Family Services ("HCJFS") and denying motions for legal custody of the children filed by various family members.   Finding no error in the grant of permanent custody, we affirm the trial court's judgment.

### 1. Factual and Procedural Background

{¶2}   On October 28, 2015, HCJFS filed a complaint for temporary custody of R.M.S., J.L.B., and N.A.B., alleging that they were neglected, abused, and dependent.  HCJFS was granted an interim order of custody of the children, and they were placed together in a foster home.  In March of 2016, a juvenile court magistrate adjudicated the children dependent and committed them to the temporary custody of HCJFS.   R.M.S. was also adjudicated abused, but the allegations of abuse regarding J.L.B. and N.A.B. and the allegations of neglect were dismissed.   The adjudications were based on the following facts, as stipulated by the parties:  R.S. is the legal father of R.M.S.; A.S. is the alleged father of J.L.B.; R.B., who was incarcerated, is the legal father of N.A.B.; HCJFS had received an allegation of physical abuse to R.M.S. in October of 2015 after R.M.S. went to school with bloody scabs on his head and reported that his mother had whipped him with a belt; and HCJFS had an open case with mother on a medical-neglect allegation concerning her failure to take the children to their medical appointments.

{¶3}   The magistrate granted HCJFS's motions to extend temporary custody in both September of 2016 and March of 2017 while the parties worked towards reunification.  In January 2017, all of mother's visits with R.M.S. were suspended

due to concerns from R.M.S.'s psychiatrist that the visits played a major role in R.M.S.'s deteriorating behavior. R.M.S. was admitted to Children's Hospital on January 29, 2017, after being violent towards his siblings as well as harming himself. R.M.S. remained hospitalized for approximately six months, and was placed in a different foster home upon his discharge.

{¶4} In September of 2017, HCJFS filed a motion to modify temporary custody to permanent custody for all three children. Petitions for legal custody of R.M.S. were filed by his paternal grandmother, paternal uncle, and paternal great aunt. Paternal grandmother filed a petition for legal custody of N.A.B.[1] And maternal grandmother filed a petition for legal custody of all three children.

{¶5} A trial was held over the course of nine days between April and October of 2018 on HCJFS's motion to modify and the various motions for legal custody. Mother, and fathers R.S. and R.B., actively participated in the trial. R.B. was incarcerated throughout the entire course of the proceedings, but he participated via video teleconference. A.S., the alleged father of J.L.B., never made an appearance.

{¶6} Extensive testimony was presented about the services that had been offered to the parents and their compliance with these services. Anthony Niederhelman, the HCJFS caseworker for the children, testified that mother first completed a diagnostic assessment in January of 2016. The assessment diagnosed mother with mild cannabis use disorder and adjustment disorder with mixed anxiety and depression, and recommended that mother participate in individual therapy and drug screens. Niederhelman testified that mother completed a parenting class, but did not otherwise satisfactorily comply with either of the assessment's recommendations. Mother failed to appear for approximately five drug screens. She did comply with one scheduled drug screen, and that screen was negative. Mother

---

[1] A family friend also filed a petition for legal custody of N.A.B., but withdrew that petition while the case was pending.

3

likewise failed to participate in individual therapy and was released from the Talbert House program for nonattendance.

{¶7} Mother completed a second diagnostic assessment in September 2017, and that assessment did not recommend any necessary services. However, the behavioral health therapist that had conducted the assessment testified that she had not received a referral from HCJFS, and consequently had not received any collateral information from the agency regarding its concerns. She testified that she had reviewed mother's 2016 diagnostic assessment. The results of the 2017 assessment were based entirely on information reported by mother. Mother reported that her marijuana use had decreased and that she was drug tested at work. Niederhelman testified that HCJFS considered the second assessment to be invalid.

{¶8} R.S. participated in a diagnostic assessment, which returned recommendations that he undergo a psychiatric evaluation and participate in individual therapy and drug screens. R.S. told Niederhelman that he would not engage in services. Because R.B. was incarcerated, he was unable to participate in services. He did testify that he completed multiple classes while incarcerated, including Life Skills, Thinking for a Change, and a parenting class.

{¶9} Mother initially visited with the children through supervised visitation at the Family Nurturing Center ("FNC"), but her attendance was not consistent and she missed many scheduled visits. As discussed above, in January 2017, visitation with R.M.S. was suspended following a therapeutic recommendation, and R.M.S. has had no contact with mother, father, or any other custody petitioner since that time. In response to the magistrate's questions about why visitation was never resumed, Niederhelman explained that HCJFS had trouble maintaining a consistent psychiatrist for R.M.S. and had not received a therapeutic recommendation to reinitiate visits.

{¶10} Due to mother's lack of attendance at visitation, visits with J.L.B. and N.A.B. were moved from the FNC to facilitated visits at mother's home. Mother's

attendance improved once the visits were moved to her home, and Niederhelman had no concerns regarding mother's interaction with J.L.B. and N.A.B. during visitation.

{¶11} R.S. only visited with R.M.S. one time before visits with him were suspended in January 2017, but he called Niederhelman at least a once a month while the case was pending to ask about R.M.S.

{¶12} All of the children suffer mental-health and behavioral issues. Visitation was suspended for R.M.S. due to concerns that the visits triggered his behavioral issues. He continued to suffer extreme behavioral issues after the visits were suspended, and was hospitalized for six months due to a "complete breakdown." Following his release from the hospital, R.M.S. began participating in therapy with Megan Stone, a psychologist at Children's Hospital. Stone testified that R.M.S. suffers from a mild intellectual disability, disruptive mood dysregulation disorder, and attention deficit hyperactivity disorder. Stone engaged with R.M.S. in behavioral therapy to address his frequent tantrums, verbal and physical aggression, irritability, food hoarding, and pattern of stealing. Stone testified that R.M.S.'s behavior has improved with therapy, and that he needs a structured environment with clear expectations of his behavior and consistent responses.

{¶13} Both R.M.S. and J.L.B. exhibit sexualized behaviors and have inappropriate sexualized knowledge for their age. J.L.B. suffers from a trauma and stress related disorder, and exhibits many behavioral issues, including aggression and cursing. He participates in therapy through St. Joseph's Orphanage to work on anger management and peer relations. The therapy has helped J.L.B. regulate his moods and he no longer needs to be removed from his classroom because of his behavior. J.L.B.'s counselor testified that he needs structure and consistency in his life.

{¶14} N.A.B. was diagnosed with reactive attachment disorder. She attends the Therapy Interagency Preschool at Children's Hospital. She participates in the

Head Start Program and receives weekly mental-health and occupational therapy to address her fine motor and emotional-regulation skills. N.A.B.'s therapist Melissa Moore testified that N.A.B. becomes aggressive at times and has difficulty with peer interactions and following directions. Moore felt that N.A.B.'s behavioral issues had increased over the past few months. N.A.B.'s counselor Jennifer Wells-Mahaney testified that she needs an environment that has limits and boundaries, as well as a loving caregiver.

{¶15} Niederhelman testified that the parents had not remedied the conditions that first brought the children into the agency's care. He was concerned with what he described as mother's ongoing substance-abuse issues, her mental-health issues, and her lack of involvement with and knowledge about the children's medical needs and behavioral issues. He conceded that he had not invited mother to attend all medical appointments for the children, but explained that he did not feel that mother should participate in the children's treatment until she addressed her own issues, which she failed to do. Niederhelman had no concerns about mother's income and found her housing to be appropriate, but he was concerned that mother's live-in boyfriend had previous allegations of abuse towards one of the children. He testified that the abuse allegation was unsubstantiated due to lack of contact with the family, but he remained concerned that mother or her boyfriend would continue to use physical discipline.

{¶16} Elizabeth Stringer, the children's guardian ad litem, testified that she believed a grant of permanent custody was in the children's best interest. Stringer had no concerns with mother's housing, but did have concerns about mother's live-in boyfriend. She was also concerned about mother's lack of attendance at the children's medical appointments, but acknowledged that mother had not been invited to participate in all the appointments due to her failure to progress in her case plan. In addition to missing medical appointments, mother failed to attend educational appointments for the children that Stringer had informed her about.

Stringer also was troubled by R.S.'s failure to participate in services and the fact that he only visited with R.M.S. one time before visits were suspended. Stringer testified that the foster parent of J.L.B. and N.A.B. was open to the idea of adoption.

{¶17} Mother testified that she had a stable job and stable housing, and that if she were to be awarded custody of the children, she would relocate from her current two-bedroom apartment to a three-bedroom apartment. Mother explained that she had attempted to participate in therapy at the Talbert House, but had been told that they did not see a reason to treat her. She testified that maternal grandmother would help her with the children when she needed assistance. Mother admitted that she was unaware of the children's various mental-health diagnoses and the therapy that they were involved in.

{¶18} Laura Rudolph-Young, an HCJFS kinship coordinator, was assigned to conduct home studies on all custody petitioners. She was unable to complete home studies on R.M.S.'s paternal uncle and N.A.B.'s paternal grandmother, as they never responded to her attempted contact. Rudolph-Young did not approve any of the remaining custody petitioners as legal custodians following the home studies. She explained that she did not approve R.M.S.'s paternal grandmother because she had failed to visit with R.M.S., had limited contact with the caseworker, had a long history of substance abuse, and had a past history with Children's Services. She did not approve the children's maternal grandmother because she also had a substantial Children's Services history, including a loss of custody of her own children for a period of time, a history of substance abuse, and a history of violent behavior that was documented in her criminal record. And while maternal grandmother had visited with J.L.B. and N.A.B., she did not have a relationship with R.M.S. Rudolph-Young further testified that she had not approved R.M.S.'s paternal great aunt because she had had no contact with R.M.S. during the case and because she had a Children's Services history for physical abuse allegations. Paternal great aunt's home study indicated that she needed to make a concentrated effort to become involved in

R.M.S.'s life and to demonstrate an understanding of his diagnosis, behavioral issues, and therapeutic needs in order to be considered for custody. She never did.

{¶19} Both N.A.B.'s paternal grandmother and R.M.S.'s paternal great aunt testified and presented witnesses in support of their custody petitions. Maternal grandmother and R.M.S.'s paternal grandmother also testified.

{¶20} The magistrate issued an entry granting HCJFS's motion for permanent custody and denying all petitions for legal custody. Mother, R.S., and R.B. filed objections to the magistrate's decision. The trial court issued an entry overruling all objections. The entry specifically found that a grant of permanent custody was in the children's best interest, that the children had been in the custody of HCJFS for 12 or more months of a consecutive 22-month period, and that the children could not or should not be placed with a parent within a reasonable time. In its entry, the trial court accepted and approved the magistrate's decision as its own, and entered judgment granting permanent custody of the children to HCJFS and denying the various petitions for legal custody.

## 2. Legal Analysis

{¶21} Mother, R.S., and R.B. have all appealed, raising several assignments of error for our review.

### A. Standing

{¶22} In a single assignment of error, R.S. argues that the trial court erred in denying the petition for legal custody of R.M.S. filed by paternal great aunt. He argues that a grant of legal custody to paternal great aunt was in R.M.S.'s best interest, and that his residual parenting rights were affected by the trial court's decision because he would have the ability to visit with R.M.S. if custody were granted to paternal great aunt.

{¶23} Paternal great aunt did not file objections to the magistrate's decision granting permanent custody of R.M.S. to HCJFS and she has not filed an appeal in this case.

{¶24} It is the law of this court that "a parent has no standing to appeal an award of permanent custody and a denial of a relative's custody petition where the parent does not challenge the termination of her parental rights and the relative did not appeal the denial of her custody petition." *In re K.C.*, 2017-Ohio-8383, 99 N.E.3d 1061, ¶ 12 (1st Dist.); *In re T.W.*, 1st Dist. Hamilton No. C-130080, 2013-Ohio-1754, ¶ 9. R.S.'s assertion of an effect on his residual parenting rights does not confer standing, as "the assertion of injury to a parent's residual parenting rights cannot be redressed where the requested relief is to award custody to a relative who did not appeal the denial of her or his custody petition." *In re K.C.* at ¶ 12.

{¶25} R.S.'s appeal is therefore dismissed.

### B. Sufficiency and Weight

{¶26} Both mother and R.B. have raised a single assignment of error contending that the trial court erred in granting HCJFS's motion to modify temporary custody to permanent custody. They argue that the grant of permanent custody was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶27} We review the juvenile court's judgment to determine whether it is supported by clear and convincing evidence. *In re J.W. and H.W.*, 1st Dist. Hamilton No. C-190189, 2019-Ohio-2730, ¶ 13. An examination into the sufficiency of the evidence requires this court to determine whether the juvenile court had sufficient evidence before it to satisfy the clear-and-convincing standard. *Id.* But when examining the manifest weight of the evidence, we review the record to determine if the juvenile court lost its way and created such a manifest miscarriage of justice in

resolving conflicts in the evidence that its judgment must be reversed. *Id.*; *In re T/R/E/M*, 1st Dist. Hamilton No. C-180703, 2019-Ohio-1427, ¶ 11.

{¶28} R.C. 2151.414(B) provides that a trial court may grant permanent custody of a child to a children-services agency if it finds that a grant of permanent custody is in the child's best interest pursuant to the factors contained in R.C. 2151.414(D), and that one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e) apply. Here, the trial court found that a grant of permanent custody was in the children's best interest, and that the following two conditions in R.C. 2151.414(B)(1) were applicable: that the children had been in the temporary custody of a children-services agency for 12 or more months of a consecutive 22-month period, pursuant to R.C. 2151.414(B)(1)(d), and that the children could not or should not be placed with either parent within a reasonable time, pursuant to R.C. 2151.414(B)(1)(a).

### i. Best Interest

{¶29} Following our review of the record, we find that the trial court's determination that a grant of permanent custody was in the children's best interest was supported by both the sufficiency and the weight of the evidence.

{¶30} Mother has been consistent in weekly visitation with J.L.B. and N.A.B. The caseworker had no concerns with mother's behavior and interaction with the children during the visitation, but mother never progressed beyond facilitated visitation. R.M.S. has not seen any family member since visits with him were suspended in January of 2017. Prior to visitation being suspended, R.S. only visited R.M.S. one time while he was in agency custody. J.L.B.'s father made no appearance in this case, and R.B. was incarcerated throughout the entire course of the proceedings. J.L.B. and N.A.B. continue to reside together in the same foster home, and that foster parent is open to the idea of adoption. R.M.S. resides in a separate

foster home, where he was placed after being released from the hospital following his breakdown that involved violence towards his siblings. *See* R.C. 2151.414(D)(1)(a).

{¶31} The children have not expressed their own desires regarding custody, but their guardian ad litem advocated for a grant of permanent custody to HCJFS. *See* R.C. 2151.414(D)(1)(b). The children have been in the custody of HCJFS since October of 2015. *See* R.C. 2151.414(D)(1)(c).

{¶32} All three children are in need of a legally secure placement that can only be achieved with a grant of permanent custody to HCJFS. *See* R.C. 2151.414(D)(1)(d). All suffer from extreme behavioral issues, particularly R.M.S. And all are in need of a structured and consistent environment and a caregiver that will set clear limits. Mother has not been involved in the children's medical or therapeutic appointments and is not fully aware of their mental-health issues. And she failed to comply with the recommendations in her first diagnostic assessment that she participate in individual therapy and submit to drug screens. While mother has stable housing and income, she resides with her boyfriend who is alleged to have abused one of the children.

{¶33} With respect to R.C. 2151.414(D)(1)(e), which requires the trial court to consider whether any of the factors in R.C. 2151.414(E)(7) to (11) apply, the magistrate found that all fathers had abandoned the children. The record supported this finding. R.B. contends that the magistrate failed to consider R.C. 2151.414(D)(1)(e) as it applies to mother. We disagree. While the trial court is not required to enumerate each of the R.C. 2151.414(D) factors in its decision, the record must reflect that the trial court considered all required factors. *In re K.T.1*, 1st Dist. Hamilton Nos. C-170667, C-170687, C-170701, C-170702 and C-170707, 2018-Ohio-1381, ¶ 14. The magistrate stated in her entry that she had considered this factor, and she made a specific finding under it with respect to the children's fathers.

### ii. 12-of-22 Condition

{¶34} Clear and convincing evidence also supports the trial court's determination that the children had been in the custody of HCJFS for 12 or more months of a consecutive 22-month period.

{¶35} A child is considered to have entered the temporary custody of an agency on the earlier of the date that the child is adjudicated or the date that is 60 days after the child's removal from the home. R.C. 2151.414(B)(1); *In re J.G.S.*, 1st Dist. Hamilton Nos. C-180611 and C-180619, 2019-Ohio-802, ¶ 37. Here, HCJFS was granted an ex parte emergency order for custody of the children on October 27, 2015, and they were adjudicated dependent (and R.M.S. additionally adjudicated abused) on March 18, 2016. The children are thus considered to have entered agency custody in this case 60 days after their removal from the home, which was December 26, 2015. HCJFS filed a motion to modify temporary custody to permanent custody on September 27, 2017. At that time, the children had been in agency custody for 21 months.

{¶36} R.B. additionally challenges the trial court's determination that the children could not or should not be placed with a parent within a reasonable time. We do not address the merits of this argument. A trial court is only required to find the applicability of one factor under R.C. 2151.414(B)(1). *In re J.R.*, 1st Dist. Hamilton No. C-190342, 2019-Ohio-3500, ¶ 26. Because clear and convincing evidence supported the trial court's determination that the children had been in agency custody for 12 or more months of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d), we need not consider any challenges to the trial court's findings that the children could not or should not be placed with a parent within a reasonable time under R.C. 2151.414(B)(1)(a), as any error with respect to that determination would be harmless. *Id.* at ¶ 29.

{¶37} Mother also argues in her assignment of error that if the children were not returned to her care, it was in their best interest to be placed in the legal custody of a family member, particularly paternal great aunt. But no family members who had petitioned for legal custody of the children objected to the magistrate's decision granting permanent custody of them to HCJFS or filed an appeal in this court. For the reasons discussed in response to R.S.'s assignment of error, mother lacks standing to raise this argument.

{¶38} The trial court did not err in granting HCJFS's motion to modify temporary custody to permanent custody, and mother and R.B.'s assignments of error are overruled.

### 3. Conclusion

{¶39} The sufficiency and weight of the evidence supported the trial court's grant of permanent custody of R.M.S., J.L.B., and N.A.B. to HCJFS, and that judgment is affirmed. R.S.'s appeal challenging the denial of legal custody to a custody petitioner who did not appeal the denial of her custody petition is dismissed for lack of standing.

Judgment accordingly.

MOCK, P.J., and CROUSE, J., concur.

Please note:
    The court has recorded its own entry on the date of the release of this opinion.