[Cite as *In re C/B Children*, 2025-Ohio-2339.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


IN RE: C/B CHILDREN          :

         :

         :

         :

APPEAL NO.   C-250146
TRIAL NO.    F/21/911 Z


*JUDGMENT ENTRY*


This cause was heard upon the appeal, the record, and the briefs.

The judgment of the trial court is affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 7/2/2025 per order of the court.**


**By:**_____
        **Administrative Judge**

[Cite as *In re C/B Children*, 2025-Ohio-2339.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: C/B CHILDREN | : | APPEAL NO. | C-250146 |
| | | TRIAL NO. | F/21/911 Z |
| | : | | |
| | : | *O P I N I O N* | |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: July 2, 2025

*Jeffrey L. Cutcher*, for Appellant Mother,

*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Cynthia S. Daugherty*, for Appellee Guardian Ad Litem.

**ZAYAS, Judge.**

{¶1}   In this appeal, appellant mother challenges the juvenile court's judgment awarding permanent custody of her three children—K.C., A.B., and N.B.—to the Hamilton County Department of Job and Family Services ("the agency"). Permanent custody of K.C. and A.B. was awarded to the agency under R.C. 2151.414(B)(1)(d), and permanent custody of N.B. was awarded to the agency under R.C. 2151.414(B)(1)(a).   The juvenile court found that, based on mother's lack of consistent engagement in case-plan services and father's abandonment and lack of engagement in services, permanent custody to the agency was in the children's best interest as a legally secure placement could not be achieved without a grant of permanent custody to the agency.

{¶2}   Mother now appeals, raising sufficiency and manifest-weight challenges to the juvenile court's determinations "regarding best interest of the children and the impossibility of reuniting with mother within a reasonable amount of time."   For the reasons that follow, we overrule the assignments of error and affirm the judgment of the juvenile court.

### I.   *Proceedings Prior to the Permanent-Custody Hearing*

{¶3}   In August 2021, the agency filed a complaint for temporary custody of K.C. and A.B., alleging that the children were abused, neglected, and dependent.   The basis of the complaint was that mother allegedly testified positive for opiates, benzodiazepine, and oxycodone at A.B.'s birth in January 2021, and A.B. was placed in the Neonatal Intensive Care Unit ("NICU") after showing withdrawal symptoms indicating positive toxicology.   The children were placed on a safety plan with a relative, and mother was to continue receiving substance-use treatment.   However, mother allegedly failed to consistently engage in substance-use treatment and failed

to appear for four random drug screens. Further, the safety-plan provider permitted mother and alleged father unsupervised access to the children, and the agency was not always able to verify where the children were or who they were with. Mother also allegedly had a pending criminal charge for interference with custody.

{¶4} The agency sought interim custody of the children that same day based on the facts alleged in the complaint. Interim custody was awarded to the agency the following day based on mother's agreement with interim custody and alleged father's failure to appear at the day-one hearing, failure to visit with the children, and failure to engage with the agency.

{¶5} In October 2021, mother filed a motion to transfer the cause to Family Treatment Court. The matter was then continued several times to provide mother with an opportunity to engage in family treatment court and substance-use treatment. During this time, mother stipulated to the facts in the complaint after being "advised of the result of signing the drug court agreement and making stipulations of fact." Mother ultimately completed a Family Access to Integrated Recovery ("FAIR") assessment but failed to follow through with the recommended services. Consequently, she was "unsuccessfully discharged" from the drug court program on December 21, 2021.

{¶6} Also on December 21, 2021, based on mother's stipulations, K.C. was adjudicated dependent, and A.B. was adjudicated abused and dependent.[1] Temporary custody of both children was awarded to the agency based on mother's agreement with temporary custody. Temporary custody was said to terminate by operation of law on August 19, 2021.

---

[1] The allegation of neglect was dismissed for both children.

{¶7} The juvenile court approved the agency's case plan. The concerns listed in the case plan for mother included substance use and her unwillingness or inability to meet the children's needs. The case plan required that mother (1) participate in substance-use treatment and maintain sobriety, (2) submit to random hair and urine drug tests, (3) complete a FAIR assessment and follow all recommendations, (4) have employment and adequate housing for her and the children, (5) engage in case management provided by the agency, and (6) attend weekly visitation and support the children emotionally while in placement.

{¶8} In June 2021, the agency filed a motion to extend temporary custody, which was granted by the juvenile court on July 25, 2022. Temporary custody was extended to February 19, 2023.

{¶9} A review-hearing entry in September 2022 indicates that mother gave birth to an infant in her home on September 13, 2022, and was transported to the hospital. The infant—now identified as N.B.—showed signs of withdrawal and was placed in the NICU. Mother tested positive for fentanyl on September 15, 2022, and was not engaged in substance-use treatment at the time.

{¶10} Shortly after, on September 27, 2022, the agency filed a complaint for temporary custody of N.B., alleging that she was ready for discharge from the hospital and was dependent based on the case history with mother and circumstances of her birth, which included "cord results" indicating the presence of fentanyl and cocaine/cocaine metabolites. The agency sought interim custody of N.B. based on the facts alleged in the complaint. Mother did not contest interim custody to the agency, so interim custody was granted the following day.

{¶11} On November 17, 2022, N.B. was adjudicated dependent based on certain facts stipulated from the complaint and temporary custody of N.B. was

awarded to the agency based on a stipulation of "all parties."

**{¶12}** On January 18, 2023, the agency filed a motion under R.C. 2151.413(A) to modify temporary custody to permanent custody to the agency for all three children, alleging that the 12-of-22 provision was met for K.C. and A.B. and none of the children could be placed with mother within a reasonable time, and permanent custody to the agency was in the children's best interest. Hearings on the motion were held on February 12 and July 5, 2024.

## II. Permanent-Custody Hearings

**{¶13}** At the first hearing, the agency caseworker—with case responsibility since the "late summer" of 2022—testified that the predominant concerns with mother at the time that he received case responsibility were substance use and lack of engagement in case-plan services. He said that the only service mother was actively engaged in at the time was visitation. He referred mother for an updated FAIR assessment in January 2023 and discussed the recommendations—mental-health services and substance-use treatment—with mother over the phone. He also scheduled random drug screens with mother. When asked if mother ever engaged in or completed substance-use services, he testified,

> I don't have any substantial proof or data to suggest that she did, but, in my January meeting with her, she told me she had remained engaged with Brightview, and I reviewed with her the purposes of the [release of information] and that I would use that to seek out that -- those records just to have a better understanding of what treatment she was receiving.
>
> She took issue with that and told me that, even though she signed the Release of Information, I wasn't privy to records that predated the

6

agency's involvement.

**{¶14}** The caseworker testified that he contacted Brightview but was ultimately unable to get records from them. He also requested the records directly from mother but never received them. Consequently, he ultimately testified that mother failed "to establish a baseline of her sobriety."

**{¶15}** Regarding visitation, the caseworker testified that mother was on the most restrictive supervision and said that mother's attendance has been "problematic" as she failed to abide by the different "boundaries" or standards set by Family Nurturing Center ("FNC"), such as calling ahead the day before and arriving early for the visit. He denied ever receiving a recommendation from FNC for a lesser restrictive setting for mother's visitation. He testified that mother remained at the same level of supervision as when visitation began.

**{¶16}** Regarding housing, the caseworker expressed concern as mother was reportedly living with maternal grandmother, who she purportedly used drugs with. He also denied ever receiving proof of stable income from mother or receiving any information from mother as to where she was working or how she was supporting herself.

**{¶17}** The caseworker further denied that mother ever successfully completed parenting education. When asked about any behavioral changes in mother, he denied ever seeing any type of behavior change and said, "Along with her admittedly failing to complete services that I referred her for, I also have ongoing concerns for her mental and emotional behaviors, and I think that those behaviors of concern would definitely impede her from safely caring for these children." When questioned by the court about his concerns, he said, based on his contacts with mother,

> She seems to have limited insight [in]to what's going on with her.

There's a lot of rigidity in her thoughts and lots of hyper focus on the fact that her two brothers were murdered in front of her, allegedly.

Her mindset seems to revolve around that trauma. Even when I'm trying to focus on case-related matters for service related matters, it tends to come back to that incident.

She admits, in some of these conversations, that she would benefit from talking to a therapist, she just doesn't know why she doesn't follow through with it. I'm not able to get to why.

**{¶18}** When asked if he believed that mother could provide a safe and stable home for the children at this time, he said, "I do not." He testified that this was due to—among other things—mother's "inconsistency with remaining in contact" with the agency, not having "a baseline understanding of her day-to-day life and the household that she shares with [grandmother]," not knowing whether mother had consistent and stable employment, not having a record of consistent mental-health treatment, and not having a baseline understanding of mother's sobriety.

**{¶19}** Regarding the children, the caseworker testified that all the children are placed in the same foster home and have an "evident" bond with the foster parents and siblings. They are also very bonded to each other. The foster family has indicated an interest in permanent placement. When asked about his observations of the children, he said, "They're clean, they're happy, they're well bonded with this family down to the pets, and they're well cared for."

**{¶20}** When asked about the best interest of the children, he said, "Due to the lack of progress from either parent and the ongoing concerns in relation to both parents, it would be in the best interest for these children to remain in the care of these foster caregivers and move towards permanency," which requires permanent custody

to the agency.

**{¶21}** At the second hearing, the agency caseworker testified that, since the last hearing, mother suggested that she was in substance-use treatment with "Brightview," and he did receive "her complete medical record" from the facility. When asked if he felt the records, in his judgment, satisfied the treatment he wished mother to complete, he said, "No, it does not." He attempted to contact mother about the records, but she was "nonresponsive." He denied that mother had completed any drug screens since the last hearing and said that mother acknowledged in her communications with him that she was not doing the drug screens. He denied that mother provided any reason as to why she was not doing the screens. Mother was still living with her mother at the time of the second hearing and, although she reported being employed to the caseworker, she would not tell the caseworker who her employer was. As to visitation, he testified that, due to issues with mother's attendance, her visits had been reduced to one-hour visits.

**{¶22}** Mother testified at the second hearing that she lives with her grandmother and has been living there for three months. She said she has furniture and supplies for the children; however, she testified that she would get her own house if she received custody of the children. When asked how she planned to do that, she said, "By working. I'm just staying with my grandmother right now because I'm her caretaker." She testified that she is employed through "Lovin' Care" as a caretaker for her grandmother. However, she clarified, "well, it's actually her mother who I caretake for, but I help my grandma as well." She said, "The insurance people that my great-grandmother goes through is who I'm working for."

**{¶23}** When asked when the last time was that she used illicit drugs, she said, "A year, I guess, I don't remember." When asked what she used, she said, "Fentanyl is

9

what I was using. I was taking Percocets that were mixed with other things." She admitted that she missed the drugs screens scheduled by the agency. When asked why, she said,

> Um, lately the reason why I have missed my screens is because the day that I get called by my caseworker, he will call me and ask me if I'm available to make it to the screens and I tell him, no, I am not, I'm at work. And he will still tell me – still proceed to tell me, okay, well, you need to be here within an hour or two hours' notice. I have no way to get [to] Fairfield within an hour or two hours, especially not when I'm taking care of somebody who is 80 years old. I just can't leave.

**{¶24}** When asked why she missed screens in the past, she said, "Some was for transportation. I was in the hospital for a few of them, which that's not an excuse for anything, I know that, but lately it's really been being my work." When asked if she has completed any recent screens, she said she has through the clinic she engages with, Sunrise. She claimed to have taken a test two weeks earlier and denied ever having a positive drug screen through Sunrise. When asked to explain her treatment program at Sunrise, she said,

> Well, I have my own person, like basically like a therapist I go and I sit with. And we talk about everything that I have done from the previous time she seen me, any goals that I've reached, as far as if my mental is okay, if there's anything I want to talk to her about, if there's anything she can help me with and stuff like that.

**{¶25}** Mother testified that she was currently in substance-use treatment at The Vine Street Center. She also said, "I went to Brightview a couple times." When asked when she began treatment at the Vine Center, she said March. When asked

when she went to Brightview, she said 2021. She said, "It was really like I went for a few months, and then I would stop. And then I would go back for another few months, it just – basically that's what it was. But I always found my own treatment centers to go to, I tried to keep myself in on it."

{¶26} When asked if she used substances in 2022 and 2023, she said, "I ended up doing something, because I was just super depressed." When asked when this was, she said, "I don't remember the exact date, but I know as soon as I did I turned myself back in to Sunrise. It was the first time I went to Sunrise over on Central Parkway." She admitted she had been to Sunrise "more than one time." When asked how long she initially participated in Sunrise, she said, "When I was at that Sunrise, I wasn't there long because they had actually gave me some type of medicine that I wasn't familiar with and it messed me up really bad." She said they put her on Buprenorphine, which "threw [her] into significant withdrawals." So, she stopped going to Sunrise in 2023. She started back in 2024. When asked why there was a break, she testified, "Honestly, I don't know, I don't know. I just thought I wasn't getting what I needed. I just felt like it didn't matter what I was doing, it wasn't getting me nowhere."

{¶27} When asked about mental-health treatment, she said, "I went to Talbert House before on Glenway and Sunrise that I go to now, they have a mental health doctor there that helps." She also said she previously went to Brightview and Greater Cincinnati Behavioral Health.

{¶28} Ultimately, on cross-examination, she denied ever successfully completing substance-use treatment to the point that she got a certificate and denied ever providing treatment records or drug-screen results to her caseworker.

{¶29} When asked about parenting services, she said she completed "more

than half" of the program in 2023. Mother admitted to missing some visits with the children. When asked why, she said, "A couple times I was in the hospital. I think one time – one time I had missed for my, I believe it was my youngest brother's funeral. And then maybe if it was the Kemper people that picked me up, if they were late, and while I was on the way there they told me that the kids had already left, so that might have been a reason." She testified that her visits with the children have now been reduced to 30 minutes. When asked to explain the bond between her and the children, she said,

> They bonded with me I guess when I gave birth to them. I have always been real, real close with my kids. They're latched on my hip 24/7. At the visits, I'm always carrying all three of them. I have to bring a baby carrier so that I can put my baby in the middle and carry both of the older ones. Like they have always been attached to me, so…

### III. Post-Hearing Proceedings

{¶30} On July 11, 2024, the magistrate entered a decision granting permanent custody of the children to the agency. The magistrate found that the children could not and should not be placed with either parent where neither parent remedied the conditions that caused the children's removal. Regarding mother, the magistrate found that she failed continuously and repeatedly to substantially remedy the conditions that caused the children's removal where she "successfully completed no case plan services and has fully rectified none of the safety concerns contained in the case plan." In doing so, the magistrate found that mother never consistently engaged in substance-use treatment, appeared for scheduled drug screens, provided proof of stable housing and/or income, successfully completed parenting education, engaged in mental-health services, or progressed beyond supervised visits with the children.

The magistrate further found that permanent custody was in the best interest of the children.

**{¶31}** The magistrate also expressly found mother to be wholly uncredible. The magistrate said,

> Mother's assertion in her testimony, due to her presentation, demeanor, and manner, presented as severely lacking in credibility. Mother constantly shifted in her seat, darted her eyes around, and gave sometimes inconsistent answers, as noted directly above as an example of her presence and where she physically was when trial began. Mother's answers came very slowly and haltingly, when she fully answered questions at all, to a very significant degree. Mother's demeanor, content, delay, body language, facial expression, and partial answers gave the magistrate every indication that portions of her testimony were being fabricated, on the stand, at trial.

**{¶32}** Specific to mother's testimony regarding her engagement in treatment, the magistrate said,

> As previously noted, the totality of mother's presentation lacked severely in credibility. The evidence presented by mother's assertions, without more, does NOT reach the level of clear and convincing. This magistrate remains unconvinced whether, in fact, mother is actually in substance use treatment or mental health treatment through Sunrise on 7/5/24, and no supporting evidence was presented.

**{¶33}** Mother timely objected to the magistrate's decision, challenging only the magistrate's best-interest determination. In doing so, mother relied heavily on her own testimony and argued that the magistrate's comments on her demeanor were

13

"highly speculative and prejudicial." She asserted that her demeanor "could just have easily been the result of fear, trepidation, and nervousness at being in trial and not due to alleged deliberate fabrication." Further, she asserted that there was "no direct evidence" that she was "anything but sober."

**{¶34}** On February 7, 2025, the juvenile court entered a decision overruling the objections and granting permanent custody of the children to the agency. Under R.C. 2151.414(B)(1), the juvenile court found—among other things—that R.C. 2151.414(B)(1)(d) (the 12-of-22 provision) applied to K.C. and A.B. and found that R.C. 2151.414(B)(1)(a) applied to N.B. (the could-not-and-should-not provision). The juvenile court further found that permanent custody to the agency was in the best interest of the children under R.C. 2151.414(D)(1).

**{¶35}** Of relevance, the juvenile court found that R.C. 2151.414(E)(1) (the failed-continuously-and-repeatedly-to-substantially-remedy-the-conditions-causing-the-child-to-be-placed-outside-the-child's-home provision) was met as to mother and stated the following,

> The primary concern that caused the children to be placed outside the home was substance abuse issues. HCJFS was asking Mother to complete either in-patient or out-patient substance abuse treatment. Although mother had minor engagement with multiple service providers, Mother did not complete a substance abuse program or was able to demonstrate that she was maintaining a level of sobriety. Mother was asked to complete drug screens, which she failed to do.
>
> HCJFS also had concerns regarding Mother's mental health. Similarly with the concerns with Mother's substance use, Mother engaged with multiple service providers, but failed to consistently

14

engage in case plan services to address her mental health needs.

Although mother visited the children throughout the case, policies had to be put in place with Mother due to her tardiness at visits and not ending visits on time per the polices at the Family Nurturing Center. Mother has failed to remedy the conditions that caused the removal of K.C., A.B. and N.B. from her care.

**{¶36}** The juvenile court further found that R.C. 2151.414(E)(3) (the provision concerning an abuse committed by a parent as described in R.C. 2151.031 between the complaint and the permanent-custody motion) was applicable to mother based on the circumstances of N.B.'s birth, and R.C. 2151.414(E)(4) (the provision concerning a parent demonstrating a lack of commitment toward the child by failing to regularly visit with the child) was applicable based on mother's visitation history.

**{¶37}** Further, regarding the children's need for a legally secure placement under R.C. 2151.414(D)(1)(d), the best-interest provision, the juvenile court said,

Mother has not substantially engaged in case plan services. Mother was asked to engage in substance abuse treatment, random drug screens, parenting enrichment classes, mental health treatment, and to have stable housing and income. Mother completed one drug screen in May of 2021, and "no showed" eighteen drug screens between June of 2021 and September of 2023. Although mother engaged with many different service providers to address her mental health and substance use, Mother did not complete any of these treatments or engage consistently.

**{¶38}** Consequently, the juvenile court awarded permanent custody of the children to the agency. Mother now appeals, raising two assignments of error. In the

15

first assignment of error, mother argues that the trial court erred in its determination that it was in the children's best interest to terminate her parental rights and place them in the permanent custody of the agency. In the second assignment of error, mother argues that the trial court erred in its determination that the children could not and should not be placed with her within a reasonable time.

### IV. *Standard of Review*

**{¶39}** The Ohio Supreme Court has said that "the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties." *In re Z.C.*, 2023-Ohio-4703, ¶ 11.

**{¶40}** "Sufficiency of the evidence and manifest weight of the evidence are distinct concepts and are '"both quantitatively and qualitatively different."'" *Id.* at ¶ 13, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10. Sufficiency depends on the adequacy of the evidence, while weight depends on the effect of the evidence in inducing belief. *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When applying a sufficiency-of-the-evidence standard of review, an appellate court should affirm a trial court's judgment if the evidence is legally sufficient as a matter of law. *Id.* When applying a manifest-weight-of-the-evidence standard of review, an appellate court "must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 14.

**{¶41}** Accordingly, in permanent-custody cases, "[a]n examination into the sufficiency of the evidence requires a reviewing court to determine whether the

juvenile court had sufficient evidence before it to satisfy the clear-and-convincing standard." *In re C.C.*, 2024-Ohio-5013, ¶ 5 (1st Dist.), citing *In re C & M Children*, 2020-Ohio-4206, ¶ 23 (1st Dist.), and *In re R.M.S.*, 2019-Ohio-4281, ¶ 27 (1st Dist.). Whereas a challenge to the manifest weight of the evidence requires a reviewing court to "review the record to determine whether the juvenile court clearly lost its way and committed such a manifest miscarriage of justice that its judgment must be reversed." *Id.*, citing *C & M Children* at ¶ 23, and *In re R.M.S.* at ¶ 27.

**{¶42}** "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as it required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.*, 2023-Ohio-4703, at ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

### A. *Law and Analysis*

**{¶43}** "R.C. 2151.414, the applicable statute, was amended effective April 3, 2023." *In re C.W.*, 2024-Ohio-4987, ¶ 43 (1st Dist.). "Only minor changes were made in this amendment." *Id.*, citing *In re P.*, 2024-Ohio-2794, ¶ 17 (1st Dist.). "We must apply the version of this statute that was in effect at the time that the motion for permanent custody was filed." *Id.*, citing *In re P.* at ¶ 17. Accordingly, we will apply the former version of the statute that was in effect on January 18, 2023.

**{¶44}** "Pursuant to former R.C. 2151.414(B), a trial court may grant permanent custody of a child to a children services agency if the court determines that a grant of permanent custody is in the best interest of the child and that one of the five conditions set forth in R.C. 2151.414(B)(1) applies." *Id.* at ¶ 44, citing *In re A.Y.C. and E.Y.C.*, 2023-Ohio-4494, ¶ 32 (1st Dist.).

**{¶45}** Former R.C. 2151.414(D)(1) stated,

In determining the best interest of a child at a hearing held pursuant to division (A) of this section . . ., the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this

section apply in relation to the parents and child.

**{¶46}** Mother argues that the juvenile court's determination was not supported by sufficient evidence and against the manifest weight of the evidence where she testified "at length" regarding the appropriateness of her visits and the bond she has with her children, and testified that she has stable housing with her mother, works as a caregiver for her great-grandmother, has not used any substance for around a year, previously engaged with four providers for mental-health treatment and drug screens, and is currently seeking mental-health treatment at Sunrise and substance-use treatment at the Vine Street Center.

**{¶47}** While it is true that mother testified as to her sporadic engagement with four treatment providers over the course of the case and her alleged engagement in mental-health and substance-use services at the time of the second hearing, mother failed to present any evidence of her alleged treatment beyond her own testimony. Significantly, the magistrate's decision—which was accepted and approved as the judgment of the juvenile court—makes strong adverse credibility determinations regarding mother.

**{¶48}** Further, mother admitted in her testimony that she never successfully completed substance-use treatment to the point that she received a certificate and admitted that she never provided any documentation of her treatment or alleged drug screens to the agency. Beyond that, the record shows that agency requested mother complete 19 drugs screens between May 2021 and September 2023, only one of which she showed up for (in May 2021), which was positive for cocaine. Further, mother admitted that she never successfully completed parenting services.

**{¶49}** Based on this record, we cannot determine that the juvenile court's findings were not supported by sufficient evidence or against the weight of the

evidence. Consequently, we overrule the assignments of error and affirm the judgment of the juvenile court.

### V.    *Conclusion*

{¶50} For the foregoing reasons, we overrule the first and second assignments of error and affirm the judgment of the juvenile court.

Judgment affirmed.

**KINSLEY, P.J.,** and **BOCK, J.,** concur.