[Cite as *In re C & M Children*, 2020-Ohio-4206.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: C and M CHILDREN | : | APPEAL NOS. C-200003 |
| | | C-200004 |
| | : | TRIAL NO. F17-2119Z |
| | : | *O P I N I O N.* |

Appeals From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  August 26, 2020

*Treleven & Klingensmith LLC* and *John Treleven*, for Appellant Mother,

*Christopher Kapsal*, for Appellant Father of D.M.1 and D.M.2,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Geoff Pittman*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services.

**MOCK, Presiding Judge.**

{¶1} In the appeal numbered C-200003, mother appeals the juvenile court's judgment terminating her parental rights with respect to her three children, J.C., currently age five, D.M.1, currently age three and D.M.2, currently age two. Although the father of D.M.1 and D.M.2 also had his parental rights terminated, he does not appeal that judgment but instead, in the appeal numbered C-200004, appeals the termination of mother's parental rights with respect to his two children, and the grant of permanent custody to the Hamilton County Department of Job and Family Services ("HCJFS"). For the following reasons, we affirm the court's judgment.

### Factual and Procedural Background

{¶2} In September 2017, J.C. and D.M.1 were removed from mother's home, where she was living with the father of D.M.1, and temporary custody was granted to HCJFS. J.C. has a different father than her sibling. Although the parental rights of J.C.'s father were terminated, he has not appealed. Therefore, any reference to "father" will refer to the father of D.M.1.

{¶3} J.C. and D.M.1 were removed from mother and father's care when it was discovered that D.M.1, one month old at the time, had a broken left femur. Apparently, the injury occurred while D.M.1 was in father's care. Mother and father claim that J.C., who was three at the time, dropped D.M.1. D.M.1 was evaluated by a team of "child-abuse doctors" from Cincinnati Children's Medical Center, who reported that D.M.1's injury was not accidental in nature and not in line with the parents' explanation.

{¶4} When the children were removed from the home, J.C. was found at a maternal aunt's house. The aunt testified that she had been caring for J.C. for a few

2

months because mother was having "financial hardships." She testified that when mother had initially dropped J.C. off at her house, J.C. had a black eye and had what appeared to be burn marks on her neck and fingers. The aunt testified that mother had told her, "[J.C.] has a black eye but no one is abusing her." The aunt reported to HCJFS that J.C. had said that father had hit her and put her head in the toilet.

{¶5} In October of 2017, father was charged with child endangerment, based on D.M.1's injuries, and a warrant was issued for his arrest. Father evaded the warrant for over a year, and therefore, HCJFS was unable to question father about the allegations of abuse or offer him reunification services. In December 2018, father shot the boyfriend of mother's sister. As a result, father was convicted of aggravated assault, and he is incarcerated until approximately June 2021. Father's attorney reported to the juvenile court that because father was already serving a prison term, the child-endangerment charge was reduced to disorderly conduct, to which the father pleaded guilty and was convicted.

{¶6} J.C. and D.M.1 were adjudicated abused, neglected and dependent. Mother completed a diagnostic assessment of functioning ("DAF"). Following that assessment, it was recommended that, among other things, mother attend therapy for her adjustment-mood disorder, participate in random drug screens, complete parenting-education classes, visit the children and maintain stable income and housing.

{¶7} At the permanent-custody hearing, Krystal Thomas, the HCJFS caseworker, testified that mother completed her parenting classes and, though inconsistent in the beginning, was currently attending individual therapy. Mother was also consistently visiting with the children. Mother had some difficulty with directing J.C.'s behavior, and her visitation status remained at the "monitored" level.

Thomas testified that mother missed several drug screens, and she had tested positive for marijuana in December 2018 and for cocaine in August 2019, when she took a hair-follicle test. But mother also completed a urine screen at the same time, and the result was negative for cocaine. Thomas testified that she did not originally have a concern with mother using drugs, but now with the positive test for cocaine, she wanted mother to be retested.

{¶8} Thomas also testified that mother had maintained, during the first ten months J.C. and D.M.1 were in the temporary custody of HCJFS, that she did not know where father lived and was not in contact with him. Yet during this time, mother became pregnant by father with her third child, D.M.2., who was born in July 2018. D.M.2 was adjudicated dependent and was placed in the temporary custody of HCJFS when he was released from the hospital. Thomas testified that HCJFS became aware of mother's contact with father after discovering she was in father's car when he had shot her sister's boyfriend. Thomas testified that she had explained to mother the agency's concern with mother having contact and a relationship with father because of the charges of violence, including child endangerment, filed against him. Thomas testified that mother could not explain how she planned to keep the children safe from father.

{¶9} Finally, Thomas testified that HCJFS still had concern with mother's housing. Originally, mother had been living with father's mother, but three months prior to the permanent-custody hearing mother had moved into an apartment owned by her parent. The apartment was in good condition, but Thomas testified that mother had originally lived in that apartment with father, but mother's parent had evicted them.

{¶10} The foster mother testified that J.C. and D.M.1 were placed in her care in March 2018, and D.M.2 was placed in her care as a newborn. She expressed a desire to adopt them and indicated that the siblings liked each other and that she and the children were happy together. Foster mother also testified that if she were permitted to adopt the children, she would be willing to maintain contact with mother.

{¶11} Mother testified at trial that she was attending therapy but did not believe it was necessary. She testified that she visits with the children, and they love her. She denied using cocaine. Mother also explained that she understands the agency's concern, which is that mother is involved with father despite being aware of the evidence indicating the children may have been injured while in his care. But mother testified that she does not believe that father caused D.M.1's injury; she testified that although she saw the report from Cincinnati Children's Hospital, she still believes the injury was accidental. She maintained that she could keep the children safe by changing her work schedule and placing the children in daycare when she was unable to care for them. Finally, she testified that she would not keep the children away from their father but would allow father to work towards seeing them when he is released from prison. She also testified that she had learned to be careful about who cares for her children.

{¶12} Following the permanent-custody hearing, the magistrate remanded custody of the children to mother with orders of protective supervision, including that father "shall not have any contact with [D.M.1 and D.M.2]" once leaving prison and that father "shall not be left alone with the above captioned children, until further order of the Court." The protective orders terminated by operation of law on

August 3, 2020. The magistrate indicated that the protective orders were a "safeguard."

{¶13} HCJFS filed objections with the juvenile court, arguing that the magistrate's decision was "against the weight of the evidence." Following a hearing on the objections, the juvenile court sustained the objections, and granted permanent custody of the children to HCJFS. Father now appeals, raising three assignments of error, and mother now appeals, bringing forth a single assignment of error.

### *Juvenile Court Conducted Proper Review*

{¶14} In his first assignment of error, father argues that the juvenile court erred by failing "to apply the correct standard" in reviewing HCJFS's objections to the magistrate's decision remanding custody of the children to mother. Specifically, father contends HCJFS failed to specify what factual issue the magistrate did not properly determine or how the magistrate inappropriately applied the law.

{¶15} Juv.R. 40(D)(4)(d) provides, in ruling on objections, the juvenile court "shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law."

{¶16} After reviewing the record, we are convinced that the juvenile court applied the correct standard in ruling on the objections by independently reviewing the matter before it. The juvenile court did not find that the magistrate had improperly determined factual issues but rather the juvenile court disagreed with the magistrate's determination of the weight to be given to the evidence. A juvenile court, because of its duty to independently review the matter before it, "is not allowed to defer to the magistrate in determining the weight and importance of

evidence." *In re J.W.*, 9th Dist. Lorain No. 10CA009339, 2011-Ohio-3744, ¶ 26. Here, the juvenile court reviewed the evidence, weighed it and came to a different conclusion than the magistrate. Therefore, the juvenile court determined that the magistrate had not properly weighed the evidence when considering the best interest of the children.

{¶17} To the extent that the father argues under this assignment that the juvenile court considered facts not supported in the record, we will address that in the later assignment dealing with the weight of the evidence. Accordingly, father's first assignment of error is overruled.

{¶18} In his second assignment, father maintains that the juvenile court "erred and abused its discretion when the juvenile court rejected the magistrate's credibility determination necessary to the decision in this matter." Father contends that the magistrate's determination that mother could protect children was "at its essence a determination of mother's credibility as to whether she would follow through on her plans in the future."

{¶19} First, we are not convinced that the magistrate made any specific credibility determination that mother would follow through on her plans to keep the children safe from father; especially in light of the magistrate's imposition of protective orders prohibiting father from having contact with the children upon his release from prison or until further order of the court. Further, the magistrate's reasoning in determining that mother could provide a legally secure placement for the children was based on the magistrate's finding that mother was "stable" and that HCJFS's concerns about father harming the children was not a pressing concern because he was currently incarcerated. The magistrate made no finding that mother could protect the children from father or that mother would follow through on her

7

plans to make sure that father only spent supervised time with the children when he was released from prison. The imposition of the specific protective orders in this case demonstrates that the magistrate was unsure whether mother would follow through on her "plans for the future."

{¶20} Second, even if the magistrate had made a credibility determination, finding that mother could protect the children from father and would follow through on her plans, the juvenile court is not required to defer to that determination. *See In re A.S.*, 1st Dist. Hamilton No. C-180056, 2019-Ohio-2359, ¶ 19 (although it may, a juvenile court is not required to defer to a magistrate's credibility determination when ruling on objections). The juvenile court, not the magistrate, is the "ultimate trier of fact." *Id.*, citing *State ex rel. Dewine v. Ashworth*, 4th Dist. Lawrence No. 11CA16, 2012-Ohio-5632, ¶ 37.

{¶21} Because the juvenile court is not required to defer to a magistrate's credibility determination and because the juvenile court has a duty to independently review the evidence before it, we overrule father's second assignment of error.

### *Permanent Custody*

{¶22} We consider mother's sole assignment of error and father's final assignment of error together, as both assignments of error challenge the sufficiency and weight of the evidence supporting the juvenile court's grant of permanent custody.

{¶23} Before granting a motion for permanent custody, a juvenile court must find, by clear and convincing evidence, that one of the conditions in R.C. 2151.414(B)(1) applies, and that a grant of permanent custody is in the children's best interest. *In re H.R.H.*, 1st Dist. Hamilton No. C-200071, 2020-Ohio-3160, ¶ 16. Clear and convincing evidence is evidence sufficient to produce in the mind of the

trier of fact a firm belief or conviction as to the facts sought to be established. *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46. An examination into the sufficiency of the evidence requires this court to determine whether the juvenile court had sufficient evidence before it to satisfy the clear-and-convincing standard. *In re R.M.S.*, 1st Dist. Hamilton Nos. C-190378, C-190386 and C-190404, 2019-Ohio-4281, ¶ 27. When reviewing a challenge to the manifest weight of the evidence, we must review the record to determine whether the juvenile court lost its way and committed such a manifest miscarriage of justice that its judgment must be reversed. *Id.*

{¶24} Before beginning our analysis, we note that the juvenile court stated in its judgment entry that father had been convicted of child endangerment. This is not supported in the record. The record demonstrates that father was charged with child endangerment with respect to D.M.1, but evaded the warrant for over a year and eventually entered a guilty plea to a reduced charge of disorderly conduct.

{¶25} Nevertheless, after reviewing the record and disregarding the court's reliance on an unsupported fact, we hold that there is clear and convincing evidence in the record to support the juvenile court's grant of permanent custody to HCJFS.

{¶26} **R.C. 2151.414(B) conditions.** There is no dispute here that the two older children satisfied the condition under R.C. 2151.414(B)(1)(d), because they had been in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period at the time the motion for permanent custody was filed. With respect to D.M.2, the juvenile court, pursuant to R.C. 2151.414(B)(1)(a), found that D.M.2 cannot or should not be placed with either parent within a reasonable time. In support of this finding, the juvenile court found, pursuant to R.C. 2151.414(E)(1), that mother failed to remedy the conditions that led to the children's removal from

9

the home. We hold that the juvenile court's finding under R.C. 2151.414(E)(1) was supported by clear and convincing evidence.

{¶27} The children were removed from the home for suspected abuse and medical neglect. Mother was aware that the agency suspected father of causing D.M.1's broken leg, that a charge for child endangerment had been filed against him, that father was evading police and that doctors from Cincinnati Children's Hospital had determined that D.M.1's injury was not accidental in nature. Despite that knowledge, mother chose to continue a relationship with father, including having another child with him, D.M.2. After father was arrested for aggravated assault for shooting the boyfriend of mother's sister, and after HCJFS had expressed its concern over mother's relationship with father, mother continued to pursue a relationship with father by visiting him in jail. And, even though father was convicted of aggravated assault and disorderly conduct, mother testified that she planned on father parenting after he was released from prison. This evidence in the record demonstrates that mother does not appreciate the danger father poses to the children. Although mother eventually testified that father would be supervised while caring for the children, the juvenile court was free to disbelieve this testimony or at the least, give it less weight, than other testimony. And any determination to give this testimony less weight is reasonable given mother's testimony that she did not believe father caused D.M.1's injury, the caseworker's testimony that mother, prior to the permanent-custody hearing, could not explain to the agency how she was going to keep the children safe from father and mother's prior untruthfulness with the agency's caseworker about being in contact with father.

{¶28} Finally, although mother completed most of her case plan, even the substantial completion of a case plan does not, in and of itself, require that children

10

be reunited with a parent who has failed to remedy the conditions that led to the removal in the first place. *See In re I.K.*, 1st Dist. Hamilton No. C-150667, 2016-Ohio-659, ¶ 1.

{¶29} With respect to the fathers of the children, no party disputes the juvenile court's finding that the children cannot and should not be returned to either father. Accordingly, we hold that the juvenile court's finding under R.C. 2151.414(B)(1)(a) that D.M.2 cannot or should not be placed with either parent within a reasonable time was supported by clear and convincing evidence.

{¶30} **Best Interest**. The juvenile court determined that it was in the children's best interest to be placed in the permanent custody of HCJFS after considering all relevant factors, including but not limited to, those expressly set forth in R.C. 2151.414(D)(1).

{¶31} The R.C. 2151.414(D)(1) factors include (a) "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers"; (b) "[t]he wishes of the child"; (c) "[t]he custodial history of the child"; (d) "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency"; and (e) "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."

{¶32} After reviewing the record, we hold that the juvenile court's finding that it was in the best interest of the children to grant permanent custody to HCJFS is supported by clear and convincing evidence. The children were removed from mother's home in September 2017 and have been out of her care for almost three years, with the youngest of the children being out of mother's care since birth. *See* R.C. 2151.414(D)(1)(c). Although mother consistently visited with the children, she

11

had some difficulty with directing J.C.'s behavior, and her visitation status never advanced past being "monitored." All three children are placed in the same foster home, thriving, and bonded with foster mother, who testified that she desires to adopt all three children. Although the two youngest children are unable to express their wishes, J.C. indicated that she wanted to live with her siblings, and the guardian ad litem supported a grant of permanent custody to HCJFS.

{¶33} Finally, the children need a legally secure placement, and that cannot be achieved without a grant of permanent custody. Although mother has appropriate housing, HCJFS still had concerns about the stability of that housing given that mother is living in an apartment of an owner who had previously evicted her. Additionally, although HCJFS did not seem overly concerned about this at first, the record supports a finding that mother has issues with substance abuse. The agency's caseworker testified that mother missed several screens, tested positive for marijuana in December 2018, and during the time the permanent-custody hearing occurred, tested positive for cocaine via a hair-follicle test, although her contemporaneous urine screen was clean. Finally, mother fails to appreciate the risk father poses to the children, and fails to demonstrate that she can keep the children safe. Another example of this, other than mother's continued relationship with father after reading the medical report indicating that D.M.1's injury was not accidental, is that mother took the oldest child to her sister's house and said, "[N]o one is abusing [J.C.]," despite the fact that J.C. had a black eye and marks on her neck and fingers.

{¶34} Given the foregoing, we overrule father's third assignment of error and mother's single assignment of error.

{¶35} In conclusion, we hold that the juvenile court independently reviewed the matter before it, including properly weighing the evidence, and that the juvenile court's grant of permanent custody is supported by clear and convincing evidence. Accordingly, we affirm the judgment of the juvenile court.

Judgment affirmed.

**WINKLER, J.**, concurs.
**BERGERON, J.,** dissents.

**BERGERON, J.,** dissenting.

{¶36} There is a reason we insist on clear and convincing evidence before terminating a parent's rights—this is the family law equivalent of the "death penalty" and we want to make absolutely sure that such a draconian remedy is warranted. Here, the record contains not a whiff of clear and convincing evidence—the caseworker generally applauded mother's efforts while acknowledging that her central area of concern was "speculative," the trial court hung its hat on evidence that simply does not exist, and the trial court faulted mother for an issue that HCJFS never requested her to remedy. To me, this smacks of a fundamental deprivation of due process, and one that should make any parent shudder. I would agree with the magistrate's decision in this case and therefore dissent.

{¶37} Given the magnitude of terminating parental rights, R.C. 2151.414 mandates that clear and convincing evidence supports the juvenile court's decision to terminate a parent's rights. Unsurprisingly, this standard sets a high threshold, requiring the evidence yield " 'in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *see In re J.W.*, 171 Ohio

App.3d 248, 2007-Ohio-2007, 870 N.E.2d 245, ¶ 15 (10th Dist.) ("[T]he clear-and-convincing standard carries the highest burden of proof that can be required in a civil proceeding[.]"). And a decision founded upon "mere calculation of future probabilities," instead of "overwhelming facts," falls well short of fostering such a firm belief. *In re S.D.*, 1st Dist. Hamilton Nos. C-200045 and C-200084, 2020-Ohio-3379, ¶ 72, quoting *In re Williams*, 11th Dist. Geauga Nos. 2003-G-2498 and 2003-G-2499, 2003-Ohio-3550, ¶ 45 (" 'A decision based on clear and convincing evidence requires overwhelming facts, not the mere calculation of future probabilities.' ").

{¶38} It should come as no surprise that this heightened standard stems from due-process concerns, ensuring that parents receive fundamental fairness during this process through rigorous scrutiny. *See In re J.W.* at ¶ 14, quoting *Santosky v. Kramer*, 455 U.S. 745, 747-748, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("[B]efore any court may completely and irrevocably sever a parent's rights in his natural child, 'due process requires that the State support its allegations by at least clear and convincing evidence.' "); *In re J.P.*, 12th Dist. Butler Nos. CA2011-01-014, CA2011-02-031 and CA2011-04-071, 2011-Ohio-3332, ¶ 31, quoting *In re Knuckles*, 12th Dist. Butler Nos. CA2003-01-004 and CA2003-01-005, 2003-Ohio-4418, ¶ 10 (" 'In order to satisfy due process, the state is required to prove by clear and convincing evidence that the statutory standards have been met.' "). Stated differently, because parents retain a fundamental liberty interest in the care and custody of their children, the clear-and-convincing standard provides an essential safeguard against the government's threat to strip a parent of that right. *See In re M.P.*, 9th Dist. Lorain No. 14CA010678, 2015-Ohio-2226, ¶ 57 ("Because parents have a fundamental liberty interest in the care, custody, and management of their

14

children, this elevated level of certainty is necessary to preserve fundamental fairness in a government-initiated proceeding that threatens an individual with a deprivation of the custody of his or her child.").

**{¶39}** This brings us to the case at hand, where the juvenile court grounded its entire determination on nonexistent facts as to father, mere conjecture regarding mother and father's future relationship, and a substance-abuse "problem" more imagined than real. The "evidence" supporting these conclusions does not withstand scrutiny, and certainly falls well short of the clear-and-convincing standard.

**{¶40}** As we begin this discussion, it's important to remember that mother successfully completed a multitude of services offered by HCJFS. During the proceedings below, HCJFS offered mother domestic-violence sessions and parenting-education classes. As to the domestic-violence services, mother connected with Women Helping Women, but her assessment ultimately provided no recommendations. Nor did HCJFS believe mother maintained a relationship marred by domestic violence, with the caseworker at trial admitting that "Mom, from what I know, she hasn't been involved in any domestic violence relationships." Similarly, HCJFS expressed no significant concerns with her parenting, with mother successfully completing parenting-education classes. Notably, unlike many children involved in parental-termination cases, none of the children here possessed extensive needs, with only J.C. requiring individual therapy to help with behaviors and learning. Mother also maintained stable housing, a point the HCJFS caseworker highlighted at trial: the "home [was] in nice condition," with "toys and clothes" there for the children.

**{¶41}** Despite mother's nearly full compliance with reunification efforts, the juvenile court rejected the magistrate's decision and granted permanent custody to

HCJFS—focusing on mother's supposed drug abuse and her contact with father: "The Children were primarily brought into the care of HCJFS due to the harm suffered by [D.M.1] at the hands of [Father], and Mother's substance abuse issues. Mother has not remedied these issues[.]"

{¶42} I begin with the juvenile court's reliance upon a fact that did not exist. As the majority concedes, nothing in the record supports the juvenile court's finding that "[Father] was convicted of child endangerment with [D.M.1] as the victim." Unlike the majority, however, I cannot disregard the court's reliance upon this unsupported fact for two reasons. First, the juvenile court rested a large portion of its decision upon the fact that father was convicted of child endangerment— emphasizing this four times in its order. More importantly, the juvenile court fastened this unsupported fact firmly to its R.C. 2151.414 analysis, finding father's conviction proves that mother "lacks the protective capacity to keep the Children safe," she demonstrates "an inability or unwillingness to provide a safe protective environment for the Children," and she fails to remedy the issues with father that led to the children's removal. The juvenile court simply cannot base its decision on evidence that (everyone agrees) does not exist. And second, with this finding discarded from the analysis, the only evidence left supporting the juvenile court's determination is conjecture and supposed substance-abuse issues HCJFS never instructed mother to remedy.

{¶43} Let's consider mother's supposed substance abuse. Despite the juvenile court's finding that the children "were primarily brought into the care of HCJFS due to * * * Mother's substance abuse issues," one could search the record in vain for substantiation of that point. In fact, HCJFS *never* recommended substance abuse treatment as a part of mother's reunification efforts. Nor did HCJFS seem

16

concerned about any alleged drug abuse, with HCJFS's caseworker testifying, "before [she] got the case and after [she] got the case, there wasn't any issues with drug problems." In fact, when mother tested positive for cocaine through the hair-follicle screen, but negative via the urine screen, the caseworker deemed the screen "questionable" and "was just shock[ed]" since this "was a first drug screen with it." (This calls to mind our governor's recent false positive test for COVID-19; false screens can happen to anyone.) The only other positive drug screen was for marijuana in December 2018 (and let's be honest, if HCJFS could seize kids from any parent who smoked some marijuana, it would break open the floodgates). Consequently, a questionable screen in hand with a lone positive screen for marijuana hardly establishes a firm belief that mother struggled with substance-abuse issues.

{¶44} Of course, if HCJFS actually believed that mother was ensnared in some type of substance-abuse problem, it should have recommended treatment as part of mother's reunification efforts (beyond its generic requirement for drug screens and to maintain sobriety). Mother cannot, and should not, now be faulted for failing to remedy a problem that HCJFS never asked her to solve. The juvenile court's fixation on drug abuse as a means for taking mother's children away finds no clear and convincing evidentiary support in the record and raises serious due-process issues. We can't keep moving the goal posts for parents trying to reunify with their children and expect them to succeed—instead, it probably looks to them more like they're trapped in some bureaucratic purgatory from which they have no hope of escape. Accordingly, I would find that clear and convincing evidence did not support the juvenile court's finding concerning mother's substance-abuse issues.

{¶45} So that leaves us with HCJFS's only real concern—mother's contact with father. Specifically, it expressed a fear that father represented a potential threat to the safety of the children and mother's failure to sever ties with him exposed the children to risks. But this concern, as the magistrate established at trial, is hypothetical in light of father's current incarceration and his projected release for jail, at a minimum, 15 months down the road. In fact, during trial, the magistrate pressed the issue when questioning the HCJFS representative: "So you're speculating whether they would be in contact 15 months to two years from now; is that correct?" Following up, mother's attorney inquired again about the conjectural nature of the concern, with the caseworker conceding this time that indeed the status of mother and father's relationship in 15 to 22 months was "speculative" at best.

{¶46} HCJFS nevertheless attacked mother as lacking a concrete "plan" as to what she would do when father completed his prison sentence. I'm not suggesting that HCJFS shouldn't request a plan, but it's difficult for anyone to know what their life situation will be in nearly two years (particularly with a global pandemic raging). I would submit that any "plan" under those circumstances would be just as speculative as HCJFS's testimony. The only certainty here is that father will not present any risk of harm to the children while he is incarcerated. If problems arise after his release, then HCJFS has the tools at its disposal to intervene.

{¶47} We cannot allow such speculation to serve as a proxy for clear and convincing evidence. HCJFS's concern regarding the relationship bears solely on "what may happen in the future, instead of what is occurring now." *See In re A.J.*, 11th Dist. Trumbull No. 2010-T-0041, 2010-Ohio-4553, ¶ 77 (reasoning that, while mother's "home conditions may again deteriorate," this "is simply a future probability. Thus, it does not satisfy the clear and convincing evidence standard.").

18

Hearing all of the evidence and sitting through the trial, the magistrate trusted mother to navigate all of this. The juvenile court took no new evidence and did not observe mother testifying—it should not second-guess these critical credibility determinations made by the trier of fact. *See In re S.D.*, 1st Dist. Hamilton Nos. C-200045 and C-200084, 2020-Ohio-3379, at ¶ 18, quoting *State v. Carson*, 1st Dist. Hamilton No. C-180336, 2019-Ohio-4550, ¶ 16 ("But, where the magistrate makes a factual finding based upon the credibility of the witnesses, the juvenile court must be mindful when conducting a de novo review of such a factual finding without entertaining new evidence that the magistrate, as the trier of fact, 'is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence presented.' "); *In re X.B.,* 10th Dist. Franklin Nos. 16AP-243 and 16AP-277, 2016-Ohio-5805, ¶ 13 ("The magistrate, as the true trier of fact, was in the better position to judge the credibility of the witnesses.").

{¶48} Consequently, mother, at the time of trial, rendered a stable and secure placement for the children. Although she may have communicated with father during his incarceration, this fact does not undermine her current ability to care and provide a safe environment for the children nor does it, at this point, negatively impact the best interests of the children. *See In re J.F.*, 11th Dist. Trumbull No. 2011-T-0078, 2011-Ohio-6695, ¶ 72 (noting that while father "does not have independent housing and is unemployed, these points, as discussed above, do not necessarily impact his current ability to care for [his child] and, more importantly, do not, at this point, have a negative impact upon [the child's] best interests."). Moreover, alternatives to terminating mother's rights exist here to address HCJFS's future concerns regarding father. And in fact, at trial, HCJFS conceded as much, with the caseworker acknowledging that "home-based

therapeutic services" in mother's home could help improve her decisions regarding the safety of her children.

{¶49}   Parental termination cases are difficult—some of the most challenging for us to decide on appeal.   But the magistrate who heard all of the evidence and observed mother's testimony trusted her, and on this record, so do I.   The lack of clear and convincing evidence permeated every aspect of the juvenile court's R.C. 2151.414 findings.   I would accordingly reverse and remand the cause to the juvenile court to adopt the magistrate's decision remanding custody of the children to mother.

{¶50}   I respectfully dissent.

Please note:

The court has recorded its own entry on the date of the release of this opinion.