# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: A.S.                    :          APPEAL NOS.  C-250045
                                                       C-250060
                              :          TRIAL NO.    F/20/593 X

                              :
                                         *JUDGMENT ENTRY*
                              :

This cause was heard upon the appeals, the record, and the briefs.

The judgment of the trial court is affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**
**Enter upon the journal of the court on 5/14/2025 per order of the court.**

**By:**_____
         **Administrative Judge**

[Cite as *In re A.S.*, 2025-Ohio-1724.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: A.S. | : | APPEAL NOS. C-250045 |
| | | C-250060 |
| | : | TRIAL NO.  F/20/593 X |
| | : | |
| | | *O P I N I O N* |
| | : | |

Appeals From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 14, 2025

*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *Marin Cofrancesco*, Assistant Prosecuting Attorney, for Appellant Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Kimberly A. Helfrich*, Assistant Public Defender, for Appellant Guardian Ad Litem,

*Kimberly V. Thomas*, for Appellee Mother,

*Dain Monroe*, for Appellee Father,

*John R. Sinclair*, Guardian Ad Litem for Mother.

**ZAYAS, Presiding Judge.**

{¶1} In this case, the Hamilton County Department of Job and Family Services ("JFS") and the guardian ad litem ("GAL") appeal from the juvenile court's judgment denying JFS's motion for permanent custody under R.C. 2151.413(A) and remanding custody of A.S. to mother. In denying JFS's motion, the juvenile court first found that permanent custody was not mandatory under R.C. 2151.414(D)(2) as A.S. could be returned to mother's care where mother remedied the initial concerns that caused A.S.'s removal. The juvenile court further found that a discretionary finding of permanent custody was not warranted as a remand of custody to mother was in A.S.'s best interest under R.C. 2151.414(D)(1). JFS and the GAL challenge the remand of custody to mother, in essence taking issue with the juvenile court's determination that mother remedied the initial concerns that caused A.S.'s removal. For the reasons set forth below, we affirm the judgment of the juvenile court.

## I.    History of the Case

{¶2} On June 15, 2020, JFS filed a complaint for temporary custody of A.S., asserting that A.S. was neglected and dependent. The basis for the complaint was allegedly mother's unsupervised contact with father due to ongoing domestic violence between the parties and father's criminal history. It was alleged that mother did not understand or appreciate the threat that ongoing domestic violence posed to A.S. At the time, mother was living in housing provided by the Hamilton County Department of Disability Services ("DDS"), and her continued contact with father also put her at risk of losing her housing with DDS. Additionally, the complaint alleged that, during the assessment, "it became clear that [mother] is delayed in her understanding of parenting, her role in parenting, and how to keep [A.S.] safe and protected." Further, the "assigned DDS worker" also allegedly expressed concern for mother's "parenting

ability and overall functioning." JFS moved for interim custody of A.S. that same day, based on the facts alleged in the complaint. Interim custody was granted to JFS the following day.

{¶3} Ultimately, after a two-day trial, A.S. was adjudicated dependent on February 26, 2021.[1] The juvenile court then granted temporary custody of A.S. to JFS by agreement of the parties on March 29, 2021, and approved the most recently filed case plan.

{¶4} The specific concerns listed for mother in the case plan included being a victim of domestic violence with father as the perpetrator, not being able to independently care for the child due to her mental health, having a DDS worker and receiving DDS services, and visiting father against safety-plan directives. The case plan provided that, to remedy the concerns, mother would engage in all recommended services being offered by DDS and additional services suggested by JFS such as an assessment by Family Access to Integrated Recovery ("FAIR"), parenting-enrichment classes, and individual therapy and med-somatic services.

{¶5} On April 16, 2021, JFS filed its first motion to extend temporary custody, which was granted by the juvenile court on May 13, 2021. Temporary custody was extended to December 15, 2021.

{¶6} On November 8, 2021, JFS filed a motion to modify temporary custody to permanent custody under R.C. 2151.413(A). The grounds for the motion were that A.S. had been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period and that permanent custody to the agency was in A.S.'s best interest. The motion also asserted that father had abandoned A.S. under R.C.

---

[1] The allegation of neglect was dismissed.

2151.414(E)(10).

**{¶7}** The hearing on the motion for permanent custody occurred on September 22 and September 25, 2023, and February 13, April 26, and May 2, 2024.[2] JFS presented 21 exhibits and the testimony of a DDS supervisor, a JFS kinship coordinator, one of A.S.'s foster parents, a JFS caseworker, and father. Mother testified on her own behalf and presented the testimony of her therapist at Talbert House and two visitation facilitators from the Family Nurturing Center ("FNC"). Father also testified on his own behalf.

**{¶8}** After the parties filed written closing arguments, the magistrate entered an order granting permanent custody of A.S. to JFS on August 20, 2024. First, the magistrate found that A.S. had been in the temporary custody of the agency for 14 consecutive months under R.C. 2151.414(B)(1)(d). The magistrate also found that R.C. 2151.414(B)(1)(b) and 2151.414(E)(13) were applicable to father. Then, the magistrate determined that permanent custody to JFS was in A.S.'s best interest under R.C. 2151.414(D)(1). Of note, the magistrate found that mother could not provide a "safe or permanent placement" for A.S., despite her engagement in services, as she had not remedied the conditions that caused A.S.'s removal.

**{¶9}** Mother objected to the magistrate's decision, arguing that the decision was against the manifest weight of the evidence as it was in A.S.'s best interest to be

---

[2] We note that, under former—and current—R.C. 2151.414(A)(2), a court is required to issue an order that grants, denies, or otherwise disposes of a motion for permanent custody no later than 200 days after the agency filed the motion. However, this section also provides that the failure of the court to issue an order within this time period "does not affect the authority of the court to issue any order" or "provide any basis for attacking the jurisdiction of the court or the validity of any order of the court." R.C. 2151.414(A)(2). Thus, the failure to abide by this timeline does not result in reversible error. *See, e.g., In re M.C.*, 2016-Ohio-8294, ¶ 14 (4th Dist.). Consequently, even though the hearings on the motion did not conclude until over two years after the motion for permanent custody was filed (for various reasons and through no fault entirely attributable to any one party or the court), the excess time that it took to resolve the motion does not constitute error that would ultimately impact the juvenile court's determination.

remanded to her custody. Most notably, she asserted that, contrary to the magistrate's decision, she remedied the conditions that initially caused A.S.'s removal from her care.

**{¶10}** After responsive briefing, the juvenile court entered an order sustaining mother's objections on January 21, 2025, after finding that the magistrate did not properly determine the factual issues and appropriately apply the law.[3] The juvenile court said that, although the magistrate was able to view the demeanor of the witnesses and judge the credibility of the testimony, the decision was not supported by the evidence and not in accordance with the law. The juvenile court appeared to agree with the magistrate's decision under the first prong of R.C. 2151.414(B)(1), finding that R.C. 2151.414(B)(1)(d) (the 12-of-22 provision) was met as A.S. had been in the temporary custody of the agency for 14 consecutive months, and that R.C. 2151.414(B)(1)(b) (the abandonment provision) was met as to father. Where the court disagreed with the magistrate was under the best-interest prong of R.C. 2151.414(B)(1).

**{¶11}** First, the court determined that permanent custody was not mandatory under R.C. 2151.414(D)(2) as A.S. could be returned to mother's home. The court said,

> [T]he court believes that Mother has demonstrated that she has remedied the initial concerns and that the child can and should be returned to her custody. Since the beginning of the case, Mother has completed parenting and domestic violence classes. She is also engaged in individual therapy through the Talbert House and is compliant with her medication. Mother was also previously engaged with [DDS] as

---

[3] On January 29, 2025, the juvenile court entered an order staying the judgment pending appeal.

6

asked by the case plan, until she voluntarily disenrolled. Her disenrollment from []DDS was raised as a concern by []JFS but the Court notes that . . . an SSA supervisor with []DDS testified that Mother voluntarily disenrolled from []DDS and then []DDS later closed her case, which she had [a] right to appeal.

{¶12} The juvenile court also specifically rejected the arguments of JFS and the GAL that mother had not demonstrated a sufficient behavioral change to warrant a finding that she has remedied the initial concerns. The court said, "The Court disagrees with HCJFS and the GAL regarding the characterization of Mother's behavioral changes." In doing so, the court rejected arguments concerning: intermittently arriving late to visits, no longer engaging with DDS, displaying concerning behavior within her interactions with the placement provider for the child, concerns regarding housing and employment, and concerns regarding the relationship with mother and father.

{¶13} Next, the juvenile court determined that a discretionary finding of permanent custody was not warranted under R.C. 2151.414(D)(1) as permanent custody to the agency was not in A.S.'s best interest. After addressing the best-interest factors and finding that both the foster placement *and mother* had positive relationships with A.S. and could provide A.S. with a legally secure placement, the juvenile court said,

> Ultimately, the Court finds that denying the Motion to Modify Temporary Custody to Permanent Custody of the child and remanding the child to Mother's custody is in his best interest. The Court does not believe that clear and convincing evidence supports an award of Permanent Custody of the child to []JFS as Mother has substantially

7

remedied the concerns and is able to provide a legally secure placement for the child. Thus, for the foregoing reasons and after careful consideration of the aforementioned factors, the Court finds that a grant of Permanent Custody of the child to []JFS is not in the child's best interest and subsequently remands custody of the child to Mother.

**{¶14}** JFS and the GAL now appeal, collectively raising three assignments of error for this court's review.

## II. *Standard of Review*

**{¶15}** The Ohio Supreme Court has said that "the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties." *In re Z.C.*, 2023-Ohio-4703, ¶ 11.

**{¶16}** "Sufficiency of the evidence and manifest weight of the evidence are distinct concepts and are '"both quantitatively and qualitatively different."'" *Id.* at ¶ 13, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10. Sufficiency depends on the adequacy of the evidence, while weight depends on the effect of the evidence in inducing belief. *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When applying a sufficiency-of-the-evidence standard of review, an appellate court should affirm a trial court's judgment if the evidence is legally sufficient as a matter of law. *Id.* When applying a manifest-weight-of-the-evidence standard of review, an appellate court "must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 14.

**{¶17}** Accordingly, in permanent-custody cases, "[a]n examination into the sufficiency of the evidence requires a reviewing court to determine whether the juvenile court had sufficient evidence before it to satisfy the clear-and-convincing standard." *In re C.C.*, 2024-Ohio-5013, ¶ 5 (1st Dist.), citing *In re C & M Children*, 2020-Ohio-4206, ¶ 23 (1st Dist.), and *In re R.M.S.*, 2019-Ohio-4281, ¶ 27 (1st Dist.). Whereas a challenge to the manifest weight of the evidence requires a reviewing court to "review the record to determine whether the juvenile court clearly lost its way and committed such a manifest miscarriage of justice that its judgment must be reversed." *Id.*, citing *C & M Children* at ¶ 23, and *In re R.M.S.* at ¶ 27.

**{¶18}** "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as it required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.*, 2023-Ohio-4703, at ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

### III. Law and Analysis

**{¶19}** In its sole assignment of error, JFS disputes the juvenile court's best-interest determination and argues that decision was not supported by sufficient evidence and against the manifest weight of the evidence.

**{¶20}** In the GAL's first assignment of error, the GAL disputes the juvenile court's best-interest determination and argues that a remand of custody was not in A.S.'s best interest. In the GAL's second assignment of error, the GAL disputes the juvenile court's finding that permanent custody was not mandated under R.C. 2151.414(D)(2).

### A. The Applicable Statutory Requirements

{¶21} As an initial matter, "R.C. 2151.414, the applicable statute, was amended effective April 3, 2023." *In re C.W.*, 2024-Ohio-4987, ¶ 43 (1st Dist.). "Only minor changes were made in this amendment." *Id.*, citing *In re P.*, 2024-Ohio-2794, ¶ 17 (1st Dist.). "We must apply the version of this statute that was in effect at the time that the motion for permanent custody was filed." *Id.*, citing *In re P.* at ¶ 17. Accordingly, we will apply the former version of the statute that was in effect on November 8, 2021.

{¶22} "Pursuant to former R.C. 2151.414(B), a trial court may grant permanent custody of a child to a children services agency if the court determines that a grant of permanent custody is in the best interest of the child and that one of the five conditions set forth in R.C. 2151.414(B)(1) applies." *Id.* at ¶ 44, citing *In re A.Y.C. and E.Y.C.*, 2023-Ohio-4494, ¶ 32 (1st Dist.).

{¶23} "With respect to a finding that permanent custody is in the best interest of a child, that finding can be either discretionary or mandatory." *Id.* at ¶ 45, citing former R.C. 2151.414(D)(1) and (2). "As we have explained, former R.C. 2151.414(D)(1) and 2151.414(D)(2) were alternative means for reaching the best-interest determination." (Cleaned up.) *Id.*, citing *In re P.* at ¶ 19. "Former R.C. 2151.414(D)(2) set forth a list of circumstances that, if all were found to exist, mandated a finding that permanent custody was in the best interest of the child." *Id.*, citing *In re P.* at ¶ 20. "In contrast, under former R.C. 2151.414(D)(1), the juvenile court was required to weigh multiple factors 'to decide whether granting an agency permanent custody of a child is in that child's best interest.'" *Id.*, citing *In re J.P.*, 2019-Ohio-1619, ¶ 39 (1st Dist.).

{¶24} As to a mandatory finding, former R.C. 2151.414(D)(2) stated,

> If all of the following apply, permanent custody is in the best

interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency:

> (a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.
>
> (b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.
>
> (c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.
>
> (d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

{¶25} As to a discretionary finding, former R.C. 2151.414(D)(1) stated,

> In determining the best interest of a child at a hearing held pursuant to division (A) of this section . . ., the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may

significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

## B. *The Juvenile Court's Determination Under R.C. 2151.414(D)(1)*

{¶26} The GAL's first assignment of error and JFS's sole assignment of error challenge the trial court's determination that a remand of custody to mother was in

A.S.'s best interest under R.C. 2151.414(D)(1).[4]  In doing so, they argue that, contrary to the juvenile court's decision, mother failed to remedy the concerns related to stable housing, her relationship with father, and her behavior.  In other words, both parties—in essence—dispute the juvenile court's finding that mother could provide a legally secure placement for A.S. under R.C. 2151.414(D)(1)(d).

**{¶27}** "A legally secure placement refers to more than just a roof over one's head, rather, a legally secure placement, 'encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs.'" *In re E.H.*, 2022-Ohio-4701, ¶ 24 (1st Dist.), citing *In re P. & H.*, 2019-Ohio-3637, ¶ 42 (1st Dist.).

### *a.  Mother's Housing*

**{¶28}** The GAL and JFS first dispute the juvenile court's determination that mother had remedied the initial concerns regarding her housing.  The juvenile court specifically rejected this argument below, stating,

> The Court also rejects []JFS' and the GAL's assertions that Mother does not have stable employment or housing.  In support of their assertion, []JFS and the GAL note that Mother has had multiple employers and moved more than once during the pendency of the case.  The Court can certainly understand the concern but is also cognizant that this case has been pending for more than four years.  While it is not ideal that Mother has changed jobs and housing, it is also clear that Mother had a home, with a lease, and multiple jobs at the time of the

---

[4] No party challenges the juvenile court's determinations under R.C. 2151.414(B)(1)(b) and (d).  Thus, it is only the juvenile court's determination of best interest that is at issue in this appeal.

trial. The record also shows that Mother benefits from the assistance of a payee, which pays the monthly rent using Mother's funds. This will likely help Mother ensure her housing is stable.

**{¶29}** The GAL argues that the juvenile court failed to acknowledge the evidence and testimony that indicates that mother had not maintained independent housing for any significant length of time. JFS argues that housing stability "remained a concern" throughout the case.

**{¶30}** The ongoing caseworker for JFS testified in September 2023 that she was able to view mother's housing that mother had been in since "sometime this year." Accordingly, she testified that mother had stable housing at the time. While she did testify that there was a prior period when she was unable to confirm where mother was living, the caseworker's testimony as of this hearing indicates mother had stable housing. Further, mother testified that she had been in this housing since December 2022, and that the caseworker had been to her apartment twice. She denied that the caseworker indicated any concerns with the housing.

**{¶31}** Subsequently, at the April 2024 hearing, the caseworker raised a concern regarding housing as mother had moved to new housing that she had been in for "roughly two weeks." The caseworker was able to view the new housing, and mother provided her with the new lease. Nevertheless, the caseworker indicated a concern that there was no furniture in the home and "nothing for the child in the home." When asked if that could be because mother was still in the process of moving, she answered, "I'm not sure." However, she testified that mother said the furniture was in the basement as she was waiting on her brother to help her move the furniture. When asked if there was storage in the basement for tenants, she answered, "I'm not sure." When asked if she asked mother to see the basement, she said, "No."

**{¶32}** On cross-examination, the caseworker agreed that mother lived in the same place for "the entire calendar year of 2023," and that this residence was appropriately furnished for mother and A.S. She was then again asked if it was possible mother was just in the process of moving to the new place, and she said, "I don't think so." Her stated reason for this belief was mother rescheduling appointments to see the new apartment and trying to "put things together" before the caseworker's visit.

**{¶33}** Mother agreed that she moved to a new apartment in April 2024. She testified that she brought the furniture from her previous apartment, plus some additional furniture. However, the furniture was in the basement because the hallway in the building is narrow, and she was having trouble getting the furniture where it was supposed to be. When asked how she was going to get the furniture up to her apartment, she said her brother was going to come with assistance from movers to help get everything into her apartment. When asked if she would be willing to call the caseworker and show her when the furniture was moved in, she said, "Yes."

**{¶34}** Ultimately, while the record does reflect that mother has moved around during the long, drawn-out pendency of this case, the most-recent evidence in the record reflects that mother had stable housing in 2023 and through the final hearing in 2024. Although mother did move in April 2024, she provided the caseworker with her new lease and there is no evidence disproving the assertion that mother was still in the process of moving her furniture into the new place.

**{¶35}** Accordingly, the evidence supports the juvenile court's finding that mother had stable housing at the time of the hearings on the permanent-custody motion. Therefore, we cannot conclude that the juvenile court's determination that mother had remedied any concerns regarding stable housing was not supported by

sufficient evidence or against the manifest weight of the evidence. *See In re Z.C.*, 2023-Ohio-4703, at ¶ 14, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984) ("If the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, more favorable to sustaining the verdict and judgment.").

### b. *Mother's Relationship with Father*

{¶36} The GAL and JFS next dispute the juvenile court's determination that mother had remedied the concerns surrounding her relationship with father. The juvenile court also specifically rejected this argument below, stating:

> The Court struggled greatly with the concerns about Mother and Father's relationship and whether domestic violence is still a concern. It is clear that the relationship between Mother and Father was tumultuous. Prior to this Court's involvement, the record shows that Mother was injured after Father's cousin shot her with a firearm. Further, after the initiation of this case, Father and [father's girlfriend] broke into Mother's home, harmed her, and Father was later convicted of burglary. Since these incidents, the record shows that [father's girlfriend] believes that Mother continues to contact and harass [her] and that Father believes that Mother has continued to attempt to contact him. The Court does not take these allegations lightly given that there is a potential of harm to multiple parties. However, despite the allegations, the record is insufficient to confirm the veracity of the allegations. Other than [father's girlfriend] and Father's testimony, no other evidence was presented to confirm that Mother was the person who attempted to contact [father's girlfriend] or that she did attempt to

16

contact Father. Furthermore, Mother and Father both independently testified that they have not had contact with each other for a prolonged period of time and that they do not wish to do so in the future. The Court also believes that Mother understands the ramifications of domestic violence. She testified regarding her understanding of the harm that can arise from domestic violence and how it can impact children. She also clearly elucidated that it is harmful for the children if they are present and witness the violence. This indicates to the Court that she understands the nature of domestic violence and the harm it can inflict on families.

**{¶37}** The GAL and JFS argue that mother did not display an understanding of domestic violence or the risk that domestic violences poses. In other words, they challenge the juvenile court's determination that mother understands the ramifications of domestic violence.

**{¶38}** The agency caseworker did testify as to her belief that mother did not comprehend domestic violence or display an understanding of the risks that domestic violences poses. She said that mother "tells [her] she's able to keep herself safe," but also "doesn't seem [to] really understand[] that keeping herself safe is keeping her child safe." However, the caseworker agreed that, although not completed right away, mother did complete a domestic-violence assessment in 2021 as requested.

**{¶39}** The domestic-violence assessment, completed in November 2021, reflects that mother documented a detailed history of her relationship with father, in which she disclosed experiencing physical, sexual, and emotional abuse, as well as intimidation, isolation, threats, and manipulation in her relationship with father. The assessment goes on to provide that mother has "various protective capabilities," and

never reported any abuse occurring in front of A.S. The recommendations in the assessment included engaging in individual therapy as needed, continuing parenting classes, and following all case-plan recommendations. The assessment also provided that the assessor would provide support and advocacy for mother "as needed." The assessment did not make any recommendations for additional domestic-violence services, and the caseworker agreed that she never requested that mother complete another domestic-violence assessment or any other domestic-violence services.

**{¶40}** Further, Mother testified at the hearing as to her understanding of domestic violence. She said that, to prevent domestic violence, you must take precautions. She said this includes avoiding interactions with father, putting A.S. first, and calling the police to protect herself and prevent future situations that could endanger her or A.S. She also agreed that she was a victim of father's domestic violence. Moreover, mother said several times that she did not want to have any interaction with father, and that she just wanted it to be her and A.S.

**{¶41}** While father did testify that mother attempted to contact him while he was incarcerated in 2022 or early 2023, he also said that it had been over two years since he talked to mother. Additionally, mother denied attempting to contact father while he was incarcerated.

**{¶42}** Beyond that, while the agency caseworker pointed to several domestic-violence incidents that occurred in previous years that raised concerns for the agency, no evidence was presented of any current domestic-violence incidents concerning mother. In fact, the agency caseworker denied any knowledge of domestic-violence incidents concerning mother in 2023.

**{¶43}** Based on the record, we cannot determine that the juvenile court's determination that mother had remedied the concern of domestic violence was not

supported by sufficient evidence or against the weight of the evidence. *See In re Z.C.*, 2023-Ohio-4703, at ¶ 14, quoting *Seasons Coal*, 10 Ohio St.3d at 80 ("If the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, more favorable to sustaining the verdict and judgment.").

### c. *Mother's Behavior*

**{¶44}** The GAL also disputes the juvenile court's determination regarding mother's "erratic" behavior. In support of this assertion, the GAL points to an incident that the foster mother testified to at the museum when a visit was supposed to occur. The juvenile court acknowledged this incident but "did not accept" the GAL's characterization of this incident as "concerning." The juvenile court stated,

> [Foster parent] testified regarding a third incident between Mother and herself. [She] testified that she was concerned about Mother's actions during a cancelled visit at the Cincinnati Children's Museum. At that visit, Mother arrived late to the visit so, in accordance with the FNC's policy, the FNC facilitator cancelled the visit between Mother and the child. Accordingly, [foster parent] and the child entered the Museum. While in the Museum, [foster parent] testified that she observed Mother arrive at the Museum. [She] testified that she saw Mother using her phone, pacing, and acting generally agitated. In response to seeing Mother, [foster parent] testified that she called the FNC facilitator and reported Mother's behavior, to which [foster parent] testified that the FNC facilitator told her to call the police or get security. [Foster parent] described her concern that Mother might follow her and the child to [foster parent]'s vehicle. The FNC facilitator later testified

19

that she could not recall telling [foster parent] to call the police about Mother's behavior. [Foster parent] did not call the police but testified that she moved the child deeper into the Museum so that he could not see Mother. When [foster parent] and the child left the Museum, they did not see or hear Mother in the Museum or at [foster parent]'s vehicle.

**{¶45}** The juvenile court's characterization of this incident is spot-on to testimony in the record. Nevertheless, the GAL appears to argue that this incident is clear and convincing evidence that mother did not make the requisite behavioral change in order to provide a legally secure placement for A.S. In support of this assertion, she points to her own testimony about the incident. The GAL testified that mother called her during the incident and was "very upset, cursing, yelling, saying that she didn't feel it was fair that she was late." She said, "It was due to the bus was running late, it took her time to get down to the museum center." The GAL was then asked if, based on that conversation with mother, she understood why the foster parent said she was nervous and didn't know how to react at the time. The GAL responded, "Yes." She also agreed that foster parent's reaction was "reasonable."

**{¶46}** While this testimony could support a finding that mother was upset in the moment, the GAL fails to set forth any argument as to how the testimony about this one incident would outweigh all the positive evidence that mother presented as to her behavioral change. The juvenile court cited favorably to the testimony of mother's therapist and the FNC facilitators who had nothing but positive things to say about mother.

**{¶47}** More specifically, mother's therapist testified that she has been consistently working with mother for two years. Initially, mother was doing weekly sessions, but they "dispersed" to once every other week after some time. When she

first started working with mother, mother had "depressive symptoms and anxiety" that they were working on. As of today, some of mother's "anxiety symptoms are moderately present, although not excessively," but mother's "depressive symptoms have been mostly reduced." The therapist agreed that mother also sees a psychiatrist through Talbert house and is receiving medication for the established diagnoses. She testified that there was an initial period when mother was not on medication, but mother has been consistent with her medication ever since.

{¶48} When asked about mother's progress on "dealing with emotional symptoms," the therapist answered, "She has significant progress both in understanding and also reducing and developing skills to mitigate symptoms and react appropriately to them." She continued, "They have also grown less strong with the depressive and anxious symptoms." She testified that mother's "progress has been consistent," and said, "And since she has decreased treatment over time, I anticipate that by her next assessment we will probably be determining an end date." She agreed that mother could continue receiving psychiatry services. She denied that she ever felt the need to refer mother for any additional support or services. Specific to parenting, the therapist testified that she talks to mother "about emotional regulation and expectations for what is healthy for treatment of a child, expectations of the child and the expectations of the mother."

{¶49} The visitation facilitator between mother and A.S. for 2023 and early 2024 testified to her observations of mother's interactions with A.S. She said the visits began at the facility and "went pretty well." Mother "was engaging in play, engaging in conversation and doing educational, like reading and activities with [A.S.]." At "some point," the visits moved to "in-home facilitated," which was out in the community. FNC allowed visits to be in the community because the staff felt mother

was able to move up to another level. The criteria for moving the visits from the facility to the community—which mother met—were no safety concerns, mother being able to provide a meal option, and mother being able to support A.S. emotionally if needed. The facilitator denied having any issues with mother's behavior during the community visits. She also denied any having any concerns regarding mother's behavior toward A.S. during a visit or ever recommending mother for further services to help her with parenting outside of the services provided by FNC. When asked about mother's progress, she said,

> I believe that she has grown in the ability to regulate her own emotions so that it does not affect the visits, affect the visits and [A.S.] emotionally. She has learned how to help him calm down, his [sic] learning how to set boundaries better. You know, when she wants [A.S.] to stop doing a certain something, if he's having a breakdown she'll talk to -- she'll talk him through it, or she'll rub his back. She'll sit with him.

> She just -- she has done really well working with him on like herself setting boundaries and helping him work through his own emotions if needed.

{¶50} She testified that A.S. responds to mother well and will give her hugs and kisses. When asked if she felt the visits needed to be in the community, she said,

> I don't believe so. I believe that they would be okay in the home. I've never seen the visits in the home, but how she is out in the community and keeping him in a safe environment and safe place, and she, you know, paying attention to him really well, I don't see there being a problem at all.

{¶51} When asked to describe mother's relationship with A.S. based on the

visits, she said,

> It's playful. It's when mom needs to set boundaries and needs him to listen, she's able to do that. They play around a lot. They have a good time. They laugh a lot together. She's very nurturing and loving. She's hugging on him, kissing him, and he's receptive to that. He seems to have a good time at the visits. His emotions don't seem -- I don't see him like struggling with mom at the visits.

When asked if she finds mother's interactions age-appropriate with A.S., she said, "Yes."

**{¶52}** The visitation facilitator between mother and A.S. for 2024 also testified to her observations of mother's interactions with A.S. She testified, "[Mother] has a hundred percent attendance. She engages very well with [A.S.], and she demonstrates what we consider care skills, which are child and adult relationship enhancement skills." She discussed one care skill that she was working on improving with mother, "quashing questions." She described this as reducing the amount of questions you ask a child while interacting to reduce overstimulation. When asked if she was saying that mother was asking A.S. too many questions, she said, "Not consistently. It was just something we addressed." She testified that it had been three weeks since she had that conversation with mother and mother has improved in terms of asking questions. When asked on cross-examination why the quashing questions conversation wasn't an issue, she said,

> It's part of what we teach in care skills. So the asking of questions isn't inherently what I would consider a concern, but by improving her care skills, by discussing how to reduce the amount of questions you ask, it creates a better bond between parent and child, so it's just one of the

skills that we teach.

**{¶53}** When asked if she ever heard mother ask anything inappropriate, she said, "Not inappropriate, no." When asked to describe how A.S. greets mother at visits, she said, "Typically mom initiates the greeting. She will see [A.S.] and greet him verbally and then walk up and hug. Typically I see like a hug and a kiss in a greeting, and [A.S.] will also hug and kiss her back." When asked what happens at the conclusion of a visit, she said, "I would say that's where they demonstrate a strong bond, because [A.S.] will hug and kiss mom, and often go back to ask for one last hug and kiss from mom before leaving." When asked about the community visits, she testified that the permanent-custody motion was "the only thing" preventing a discussion of visit expansion for mother.

**{¶54}** Because the record contains ample evidence to support the juvenile court's determination regarding mother's positive behavioral change, we cannot hold that the juvenile court's determination regarding mother's behavior was not supported by sufficient evidence or against the manifest weight of the evidence. *See In re Z.C.*, 2023-Ohio-4703, at ¶ 14, quoting *Seasons Coal*, 10 Ohio St.3d at 80 ("If the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, more favorable to sustaining the verdict and judgment.").

### d. Conclusion on Legally Secure Placement

**{¶55}** Based on mother's case-plan compliance and behavioral change, the juvenile court found that mother could provide a legally secure placement for A.S. The court said,

> Since the removal of the child from Mother, it is clear that
> Mother has made great progress in completing case plan services,

making behavioral changes, managing her mental health, and improving her parenting skills. Mother reportedly brings appropriate food and clothes for the child at visits, is patient with the child and manages his behaviors appropriately. She also has obtained and maintained stable housing and employment. Finally, while []JFS and the GAL raised concerns about Mother's mental health and the history of domestic violence between Mother and Father, clear and convincing evidence simply does not show that these concerns are still present.

**{¶56}** A review of the record reveals that these findings are supported by the record. Most notably, the agency caseworker agreed that mother had completed all the services requested of her. Mother's therapist testified to mother's continuous engagement with services and positive improvement, and the FNC facilitators had nothing but positive things to say about mother and her interaction with A.S. during visits. Additionally, the concerns raised in this case were based on events that occurred in the past and no evidence was put forth of any current events of domestic violence that continued the cause for concern.

**{¶57}** Beyond that, mother consistently testified about her remorse for the situation and the changes she has made to be a better parent moving forward. When mother was asked what she wanted the court to know about why coming home with her would be in A.S.'s best interest, she said,

> I feel -- I'm not a perfect parent, but I'm a changed parent, and I feel that I have really made the sacrifices that I've made in my parenting and in this journey of being in this case I've learned a lot, that I've taught myself to never do the things that I've done before, and to never do this again, or go through this again, because it's not fair to a child. It's not

fair to a child to have to go through these things, whether it's emotionally, physically, or mentally. I just don't feel that it's fair that he is -- that he is where he is because of my poor decision making from my past. And that is my fault, and I can't put that on -- the decisions that I've made, I can't put that on nobody else but me. I can't put that on them, him, you, anybody else. I take responsibility for what I did. But I know as a parent I've grown. I've bonded with my child and I feel that I am more stable and safer than I was before.

**{¶58}** Based on this court's thorough review of the evidence in the record, we hold that the juvenile court's determination that mother could provide a legally secure placement for A.S. is supported by sufficient evidence and not against the manifest weight of the evidence.

### e. The Determination of A.S.'s Best Interest

**{¶59}** Beyond the dispute as to a legally secure placement, neither the GAL nor JFS set forth any specific challenge to the juvenile court's findings under the remaining best-interest factors under R.C. 2151.414(D)(1), and a review of the record reveals that the juvenile court's best-interest determinations were supported by sufficient evidence and not against the weight of the evidence.

### C. The Juvenile Court's Determination Under R.C. 2151.414(D)(2)

**{¶60}** Under the GAL's second assignment of error, the GAL argues that the record mandated a finding that permanent custody to the agency was in A.S.'s best interest under R.C. 2151.414(D)(2). JFS also appears to challenge this determination as part of its assignment of error, although not setting forth any specific argument as to this finding. The juvenile court determined that permanent custody was not mandatory under R.C. 2151.414(D)(2)(a) as A.S. could be returned to mother's care.

**{¶61}** In support of this assignment of error, the GAL raises the same challenges already addressed above regarding whether mother remedied the initial concerns that caused A.S.'s removal. For the same reasons already explained, we hold that the juvenile court's determination that mother remedied the initial concerns that caused A.S.'s removal was supported by sufficient evidence and not against the manifest weight of the evidence.

**{¶62}** Because mother remedied the initial concerns that caused A.S.'s removal, we cannot find error in the juvenile court's determination under R.C. 2151.414(D)(2)(a) that A.S. could be returned to mother's care. Consequently, permanent custody was not mandated under R.C. 2151.414(D)(2).

### IV. Conclusion

**{¶63}** For all the foregoing reasons, we over JFS's assignment of error and the GAL's assignments of error and affirm the judgment of the juvenile court.

Judgment affirmed.

**CROUSE** and **NESTOR, JJ.,** concur.